STATE OF CONNECTICUT *v.*
NICHOLAS A. BRUNETTI*
(SC 16788)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

---

* Superseded. See *State* v. *Brunetti*, 279 Conn. 39, 901 A.2d 1 (2006).

Argued October 20, 2004—officially released November 1, 2005

*Richard Emanuel,* for the appellant (defendant).

*Robert J. Scheinblum,* assistant state's attorney, with whom, on the brief, was *Mary M. Galvin,* state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Nicholas A. Brunetti, appeals from the judgment of conviction, ren-

dered after a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the trial court improperly admitted into evidence certain items obtained as a result of a search of the defendant's home, including his bloodstained clothing and evidence that the clothing had been washed.[1] The search was conducted pursuant to a consent given to the police by the defendant's father despite the fact that the defendant's mother had objected to the search. The defendant contends that the search was conducted in violation of our state constitution because his father's consent was permitted to trump his mother's objection to the search. We agree with the defendant and, therefore, we reverse the defendant's conviction and remand the case for a new trial.

The jury reasonably could have found the following facts. On the evening of June 23, 2000, thirty-five year old Doris Crain (victim) left her house and walked to Sonny's Bar on Campbell Avenue in West Haven. After the victim left the bar, she encountered the nineteen year old defendant near the intersection of Campbell Avenue and Main Street. The victim approached the defendant and asked whether he had any marijuana. The defendant replied that he did and asked the victim to smoke with him behind the Washington Avenue Magnet School. After sharing a marijuana cigarette, the defendant and the victim began kissing and engaging in sexual foreplay. After a short time, the defendant

---

[1] The defendant also claims that the trial court: (1) abused its discretion by denying the defendant's request for a one day continuance to locate a witness; and (2) improperly denied his motion to suppress his second statement to the police. Because our conclusion that the trial court improperly admitted into evidence the defendant's bloodstained clothing results in this case being remanded for a new trial, we need not consider the first claim, which may not arise again at the new trial. We do not directly address the second claim because the defendant's second statement to the police resulted from the discovery of the bloodstained clothing and therefore was inadmissible as fruit of the illegal search.

and the victim partially removed their clothing, laid on the ground and began engaging in sexual intercourse. After having intercourse for about fifteen minutes, the victim asked the defendant to stop because the sexual activity was hurting her. The defendant ignored the victim's request and he continued until he reached an orgasm. After the intercourse ended, the victim got up, cursed at the defendant and told him she was going to call the police. In response to the victim's threat, the defendant grabbed the victim in a chokehold, punched her in the head, dragged her by her hair, and then by her feet, across the ground, and repeatedly struck her over the head with an empty glass bottle. The defendant then left the victim's body in the high grass behind the school, throwing her clothing and the bottle nearby. As he left the school area, the defendant walked past Jerrell Credle, Mike Banores, Jose Rivera and Michael Scott, who were seated at a picnic table on the school grounds. Credle recognized and greeted the defendant. The defendant acknowledged Credle, but did not stop to talk to him or the others, and continued to his home at 208 Center Street, where he lived with his parents.

Following the discovery of the victim's body the next day, the West Haven police department obtained information suggesting that the defendant might be involved in the victim's murder. Detectives Anthony Buglione and Joseph Biondi (detectives) went to the defendant's home to question the defendant. The detectives approached the defendant's parents, who were sitting on the front porch of their home, and asked to speak with the defendant. Anthony Brunetti, Sr., the defendant's father, went inside the house to find the defendant while the detectives remained outside with the defendant's mother, Dawn Brunetti. The defendant emerged from the Brunetti home with his father ten to fifteen minutes later. The detectives then told the defendant that they wanted to bring him to the West

Haven police department for questioning and asked him to produce the clothes he had worn the previous evening. The defendant retrieved some clothing from his bedroom, and the detectives then drove the defendant to the police station for questioning. The defendant's parents followed the detectives to the police station in their own car.

At the police station, the detectives questioned the defendant in an interrogation room, while the defendant's parents remained in the station's waiting area. Sometime during the questioning, Detective James Sweetman of the West Haven police department and State Trooper Mark Testoni approached the defendant's parents and asked them to sign a consent form to allow the West Haven police to search the Brunetti residence. The defendant's father signed the form[2] but the defendant's mother refused to sign the form. The defendant's parents then left the police station to let the police into their home to conduct the search while the defendant remained at the station with the detectives. During the search of the home, the police looked inside the washing machine and found several items of recently washed clothing, including a pair of sweatpants, two tank tops and a towel. The sweatpants and towel exhibited "bleach-like stains," and one of the tank tops exhibited reddish-brown blood-like stains. When Detective Buglione, who was at the police station questioning the defendant, learned of this discovery, he told the defendant and asked him to elaborate. The defendant then became upset and requested a Bible. The detectives subsequently issued Miranda[3] warnings to the defen-

[2] In this appeal, the defendant first contends that the search of his home was illegal because his father's consent to the search was coerced. Because we conclude that under article first, § 7, of our state constitution, *both* present joint occupants must consent to the search of jointly controlled property to render the search valid, we need not address this claim.

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

dant, who proceeded to give an inculpatory statement to the detectives, describing in detail the manner in which he had murdered the victim. The defendant subsequently was placed under arrest and charged with murder. After a jury trial that resulted in a guilty verdict, the defendant was sentenced to sixty years in prison. The defendant subsequently filed an appeal from his conviction to this court pursuant to General Statutes § 51-199 (b) (3).

The defendant's dispositive contention on appeal is that because his mother declined to consent to the search of his home, the search was illegal and the evidence found pursuant to the search improperly was admitted into evidence by the trial court. See, e.g., *State v. Reynolds*, 264 Conn. 1, 42, 836 A.2d 224 (2003) ("[u]nder the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality" [internal quotation marks omitted]), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). More specifically, the defendant contends that, under article first, § 7, of the constitution of Connecticut, when joint occupants have equal control over the premises, and both are present when consent to the search is sought, both joint occupants must give their consent in order for the ensuing search to be valid pursuant to the consent exception. We agree with the defendant.[4]

---

[1] The state claims that the defendant does not have standing to invoke his mother's privacy rights. We disagree. The touchstone to determining whether a person has standing to contest an allegedly illegal search is whether that person has "a legitimate expectation of privacy in the invaded area. . . . The determination of whether such an expectation exists is to be made on a case by case basis . . . and requires a two-part inquiry: first, whether the individual has exhibited an actual subjective expectation of privacy, and second, whether that expectation is one society recognizes as reasonable. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 94, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

As a preliminary matter, we set forth the applicable standard of review. Because the claims raised by the defendant are claims of law, our standard of review is plenary. *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004).

The following additional facts are relevant to our resolution of this claim. Both of the defendant's parents testified at trial that the defendant's mother had been asked to sign a consent to search form, and that she had declined to sign the form. Specifically, when asked whether his wife signed the consent to search form, the defendant's father stated that "they asked if we

"[T]he fact that a person does not have the exclusive use of an area does not bar his having a reasonable expectation of privacy that furnishes standing to object to a government search." *State* v. *Reddick*, 207 Conn. 323, 330–31, 541 A.2d 1209 (1988). In the present case, the defendant has established that he resided in the house, the object of the search in question, with his parents. The defendant's parents testified that the defendant had his own room in the house, and that they had access to his room but that "he had his own privacy." Moreover, this court consistently has stated that "[t]he sanctity of the home has a well established place in our jurisprudence." *State* v. *Geisler*, 222 Conn. 672, 687, 610 A.2d 1225 (1992). "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home . . . ." (Internal quotation marks omitted.) *State* v. *Brosnan*, 221 Conn. 788, 806, 608 A.2d 49 (1992). Based on the foregoing standard, it is clear that the defendant has standing to contest the search of his home.

Indeed, the defendant faced two obstacles to challenging the search of his home: (1) that the warrant exception on which the police relied—consent—was not satisfied; and (2) that the search violated *his* rights under article first, § 7, of the state constitution. Our conclusion that consent is rendered invalid if any party with authority to object is present and does so addresses the first issue, and the dissent necessarily concedes the second by virtue of its statement that the defendant had a legitimate expectation of privacy in the house. See *Rakas* v. *Illinois*, 439 U.S. 128, 148, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978) (concluding that, in determining whether defendant was vicariously asserting another's fourth amendment right, dispositive question is whether defendant had "legitimate expectation of privacy in the particular areas of the [place] searched"). In other words, by demonstrating his own legitimate expectation of privacy and challenging the search based on his mother's refusal to consent, the defendant is not vicariously asserting his mother's constitutional rights, but, rather, is vindicating his own.

would sign [the form] and my wife declined. She did not want to sign it." The defendant's mother also testified that she did not sign the form. Furthermore, the trial court, in an oral ruling on the defendant's motion to suppress evidence, distinguished the facts of the present case from those in *State* v. *Jones*, 193 Conn. 70, 475 A.2d 1087 (1984), wherein both parents of the defendant signed a consent to search form, noting that "[i]t is clear to the court that this is not an issue as decided in [*Jones*], one of acquiescence to . . . a claim of lawful authority. . . . It is clear that at least one of the parties [in the present case], *one of the parents declined to consent to [the] search.*"[5] (Emphasis added.) We construe this as a factual finding by the trial court that the defendant's mother refused to give consent to the search.

Because the defendant did not preserve this claim properly at trial, he seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), and the plain error doctrine. In *Golding*, we set forth the conditions under which a defendant can prevail on an unpreserved constitutional claim. Id., 239–40. A defendant can prevail only if all of the following conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determina-

---

[5] At issue in *Jones* was the defendant's claim that, although his parents had both signed the consent to search forms, they had merely acquiesced by signing the forms "because they believed that they had no choice." *State* v. *Jones*, supra, 193 Conn. 78.

tion of whether the defendant may prevail." *State* v. *George B.*, 258 Conn. 779, 784, 785 A.2d 573 (2001).

We first conclude that the record in the present case is adequate for review of the defendant's claim that the search of his home was illegal, and that he therefore has satisfied the first prong of *Golding*. The dissent criticizes this conclusion as an "egregious misapplication of the first prong of [*Golding*] . . . ." Application of the standards set forth in *Golding* itself, however, clearly indicates that the record is adequate for review of the defendant's claim. In *Golding*, we stated that "[t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are *insufficient, unclear or ambiguous* as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." (Emphasis added.) *State* v. *Golding*, supra, 213 Conn. 240.

In the present case, the record is sufficiently clear and unambiguous and contains the factual background necessary for review of the defendant's claim. Specifically, the trial court's finding that "[*i*]*t is clear that* at least one of the parties, one of the parents, declined to consent to [the] search" indicates that the defendant's mother refused to agree to a search of her home, which she owned jointly with her husband. (Emphasis added.) It is precisely this finding which perfects the record for review. The trial court made this finding after hearing testimony from both of the defendant's parents concerning the mother's failure to consent to the search and observing the demeanor of both witnesses as they testified. The trial court emphasized that the failure of the defendant's mother to consent to the search was "clear."

The state argues, and the dissent agrees, that the record is not adequate for review because the defendant's mother did not expressly "object" to the search. Specifically, the dissent contends that the testimony of the defendant's parents established only that the defendant's mother did not sign the consent to search form, and that this testimony therefore cannot support the trial court's finding that she declined to consent to the search. We disagree with the dissent's strained analysis of this testimony. The adequacy of the record cannot turn, without more, on the mere choice of words used by witnesses or the trial court. This court consistently has declined to attach talismanic significance to the presence or absence of particular words or phrases. See, e.g., *State* v. *Robinson*, 227 Conn. 711, 731, 631 A.2d 288 (1993) (trial court's "failure to utter the talismanic words that the evidence was 'more probative than prejudicial' does not indicate that it did not make such a determination"); *State* v. *Onofrio*, 179 Conn. 23, 45, 425 A.2d 560 (1979) ("[t]here is no talismanic ritual of words that must be spoken by a dying declarant" to render statements admissible); *State* v. *Peters*, 40 Conn. App. 805, 823, 673 A.2d 1158 (jury charge not improper for failure to recite talismanic words), cert. denied, 237 Conn. 925, 677 A.2d 949 (1996). In the present case, the dissent attaches talismanic significance to the absence of a particular word, i.e., the failure of the witnesses to say that the mother "objected," despite the fact that the testimony clearly indicated the unwillingness of the defendant's mother to consent to the search. The defendant's father, when asked whether his wife had signed the consent to search form, testified that "[she] declined. *She did not want to sign it.*" (Emphasis added.) The defendant's mother testified that she did not sign the consent to search form. We decline to usurp the trial court's role as the fact finder by ascribing undue significance to the precise formulation of this

testimony. The trial court observed firsthand the demeanor of the defendant's parents when they testified and was best situated to evaluate the overall tenor of their testimony. On the basis of its observations, the trial court found that the defendant's mother "declined to consent to the search." On appeal, we are called upon to determine only whether this record is unclear or ambiguous, and three members of this court find that it is not.

The dissent also contends that our conclusion that the record is adequate for review is "unfair to the state" because the state lacked notice that the issue of the defendant's mother's consent would be raised on appeal. We note that this view fails to account for the unique nature of a *Golding* review. Ordinarily, an objection to a particular statement at trial alerts the state to the possibility of the claim being raised on appeal. Because a *Golding* claim by definition is a claim that has not been raised explicitly at trial, the unavailability of explicit notice to the state is inherent in the exercise of a *Golding* review.[6] Review of unpreserved constitutional claims has been a part of the criminal jurisprudence of this state since at least 1973. See *State* v. *Evans*, 165 Conn. 61, 69–70, 327 A.2d 576 (1973). The

---

[6] The dissent also contends that our conclusion that the record is adequate for review is "especially unfair because . . . the state never had any reason to address the issue of the mother's consent." An examination of the record, however, reveals that the state had reason to address the issue of the defendant's mother's consent at the suppression hearing. It is well established that the state bears the burden of proving lawful consent to a search. *State* v. *Reynolds*, supra, 264 Conn. 44. Though the defendant only explicitly challenged the validity of his father's consent at the suppression hearing, it is clear that the issue of the defendant's mother's consent was also implicated in that claim. In the present case, it is undisputed that both the defendant's mother and father were together when consent to search their home was sought. Because the state could not have foreseen whether it would prevail in establishing the voluntariness of the defendant's father's consent, it is clear that it had sufficient opportunity and incentive to address the issue of the defendant's mother's consent at the suppression hearing.

state therefore must be mindful at trial of the potential that the defendant will raise unpreserved constitutional claims on appeal. Thus, we determine that the record in the present case is adequate for review of the defendant's unpreserved claim.

We turn next to the second prong of *Golding*, a determination of whether the unpreserved claim is of constitutional magnitude alleging the violation of a fundamental right. We conclude that the defendant's claim is of constitutional magnitude. Article first, § 7, of our state constitution provides in relevant part: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . . ." Because the search of the defendant's home conducted in the face of an objection by the defendant's mother clearly implicates the defendant's right to be free from unreasonable searches as set forth in article first, § 7, we find that the defendant has satisfied the second prong of *Golding*.

The third prong of *Golding* requires us to determine if the alleged constitutional violation exists and clearly deprived the defendant of a fair trial. Because the defendant's claimed constitutional violation rests on our state constitution, we must employ the analytic framework that this court established in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992).[7] In *Geisler*, this court set

---

[7] We do not conduct an analysis under the federal constitution for two reasons. First, the defendant has briefed his constitutional claim primarily and most substantially under the state constitution, employing the framework set forth in *State* v. *Geisler*, supra, 222 Conn. 672. Second, fourth amendment jurisprudence is not instructive with regard to the defendant's claim in the present case. The issue of whether the consent of both present joint occupants is required when authorities seek consent to search the occupants' jointly controlled property has not been addressed directly by the United States Supreme Court. The concurring opinion suggests that we are "deviating from our normal course" in resolving this appeal solely under our state constitution. See footnote 4 of the concurring opinion. We disagree. This court has employed various approaches in deciding whether to analyze a constitutional claim under the federal or our state constitution. See, e.g., *State* v. *Spencer*, 268 Conn. 575, 578 n.5, 848 A.2d 1183 (declining to reach

forth six factors to be used in analyzing an independent claim under this state's constitution. Id., 685. Those factors are: (1) the text of the operative constitutional provisions; (2) related Connecticut precedents; (3) persuasive relevant federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebearers; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. Id.; *State* v. *Griffin*, 251 Conn. 671, 684, 741 A.2d 913 (1999). After analyzing the defendant's claim through the use of these factors, we conclude that the search of the defendant's home in the present case violated article first, § 7, of our state constitution and, further, that this constitutional violation clearly deprived the defendant of a fair trial. We determine that article first, § 7, of the Connecticut constitution requires that the police must obtain the consent of all joint occupants who are present when consent is sought in order for a search by consent to be valid. Because, in

---

claim under state constitution when federal constitution was dispositive of issue), cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004); *State* v. *Santos*, 267 Conn. 495, 497 n.4, 838 A.2d 981 (2004) (deciding claim under state constitution where standard for warrantless patdown searches was same under federal and state constitutions); *Leydon* v. *Greenwich*, 257 Conn. 318, 333, 777 A.2d 552 (2001) (deciding claim under both state and federal constitutions); *State* v. *Joyce*, 229 Conn. 10, 15–16, 639 A.2d 1007 (1994) (declining to reach claim under federal constitution when state constitution was dispositive of issue). While a canvass of recent decisions reveals that this court often has analyzed a federal constitutional claim to the exclusion of a parallel state constitutional claim, these cases frequently cite the appellant's failure to brief adequately and independently his state constitutional claim as grounds for employing only a federal constitutional analysis. See, e.g., *State* v. *Vakilzaden*, 272 Conn. 762, 768 n.11, 865 A.2d 1155 (2005) (declining to review defendant's state constitutional claim where no independent analysis under state constitution was presented); *State* v. *Sinvil*, 270 Conn. 516, 518 n.1, 853 A.2d 105 (2004) (same); *State* v. *Romero*, 269 Conn. 481, 486 n.7, 849 A.2d 760 (2004) (same); *State* v. *Moran*, 264 Conn. 593, 605, 825 A.2d 111 (2003) (same). In the present case, the defendant's analysis focuses almost exclusively on our state constitution. We therefore determine that the claim appropriately is resolved under the state constitution.

the present case, both of the defendant's parents, co-owners and co-occupants of the home, were present when the police sought consent to search the home, and because the defendant's mother refused to give her consent, the search was conducted in violation of article first, § 7, of our state constitution.

The first *Geisler* factor we consider is the text of article first, § 7, of the constitution of Connecticut, which provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." This court consistently has concluded that the text of article first, § 7, is similar to the language of the fourth amendment to the United States constitution.[8] The court previously has acknowledged that fourth amendment jurisprudence may inform our understanding of article first, § 7. See, e.g., *State* v. *Miller*, 227 Conn. 363, 381, 630 A.2d 1315 (1993); *State* v. *Marsala*, 216 Conn. 150, 159, 579 A.2d 58 (1990). Textual analysis of the fourth amendment has emphasized that that amendment "did not guarantee some generalized right of privacy and leave it to this Court to determine which particular manifestations of the value of privacy society is prepared to recognize as reasonable. . . . Rather, it enumerated (persons, houses, papers, and effects) the objects of privacy protection to which the *Constitution* would extend . . . ." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Minnesota* v. *Carter*, 525 U.S. 83, 97, 119 S. Ct. 469, 142 L. Ed. 2d

---

[8] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

373 (1998) (Scalia, J., concurring). The text of article first, § 7, therefore establishes specific protection for an individual's right to privacy in the home. The fundamental importance of this constitutional right is reinforced by an examination of the historical evidence surrounding the adoption of article first, § 7, which is the second *Geisler* factor.

"Because the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution were enacted in response to the same historical experience and protect the same fundamental values, the early history of the provisions may be analyzed together." *State* v. *Miller,* 29 Conn. App. 207, 217, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993); see *State* v. *Marsala,* supra, 216 Conn. 167–68 n.12. "The language of article first, § 7, which was based upon the fourth amendment, was adopted with little debate." *State* v. *Mikolinski,* 256 Conn. 543, 548, 775 A.2d 274 (2001); see *Moore* v. *Ganim,* 233 Conn. 557, 600, 660 A.2d 742 (1995). "It is axiomatic that the right to be secure in one's home is central to the prohibition of article first, § 7, of the state constitution, against unreasonable intrusions by the state." *State* v. *Bernier,* 246 Conn. 63, 75, 717 A.2d 652 (1998). "This robust protection finds its roots in the fundamental importance of the home as the locus of privacy. The sanctity of the home has a well established place in our jurisprudence. The English common law, upon which much of this country's constitutional and common law is based, recognized that intrusion into the home constituted especially egregious conduct. From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle." (Internal quotation marks omitted.) *State*

v. *Eady*, 249 Conn. 431, 455, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999).

Both the text of article first, § 7, and its historical context ordain the fundamental significance of the constitutional right to privacy in the home. An examination of the third *Geisler* factor—relevant state precedent—reveals a long-standing recognition of the privacy rights of all occupants of the home, as well as a preference for obtaining warrants in order to conduct searches. Both this court and the United States Supreme Court consistently have stated that a "search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *State* v. *Badgett*, 200 Conn. 412, 423, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Relevant to the discussion in the present case is the exception for a search conducted pursuant to valid consent. It is well recognized that valid consent to enter and search a home is an exception to the warrant requirement. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Jones*, supra, 193 Conn. 78–79; *State* v. *Harris*, 10 Conn. App. 217, 224, 522 A.2d 323 (1987). "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party . . . ." *United States* v. *Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). "In order for a third party's consent to a search to be valid, the consenting party must have common authority over the premises to be entered or searched." *State* v. *Reagan*, 11 Conn. App. 540, 544, 528 A.2d 846 (1987).

The common authority principle highlights a critical point in our analysis of the defendant's claim. It is well

established that "[t]he authority which justifies . . . third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that *any of the co-inhabitants has the right to permit the inspection in his own right . . . .*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Zindros*, 189 Conn. 228, 246–47, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). Implicit in an individual's right to permit inspection of jointly controlled property is the corresponding right to deny such inspection. Therefore, once an individual has demonstrated mutual use of and joint access and control of the property in question, he or she also has the authority to refuse to grant consent to search that property. Framed in the context of the common authority principle, the question in the present case becomes whether the authority of the defendant's father, who consented to the search, or that of the defendant's mother, who refused to consent to the search, should prevail.

While this court previously has not considered this precise question, in balancing an individual's rights against police expediency under article first, § 7, "[o]ur cases have consistently held that both the state and federal constitution evince a preference for warrants to protect the individual rights of our citizens." *State* v. *Trine*, 37 Conn. App. 561, 567, 657 A.2d 675 (1995), rev'd on other grounds, 236 Conn. 216, 673 A.2d 1098 (1996). This preference flows from this court's conjunctive reading of article first, § 7. In construing the provisions of article first, § 7, this court "read[s] the two clauses of article first, § 7, in conjunction—a warrantless search is per se unreasonable, justified only by limited exceptions—rather than in disjunction—a search is valid if it is reasonable, and the presence of

a warrant is just one factor in the determination of reasonableness." (Internal quotation marks omitted.) *State* v. *Joyce,* 229 Conn. 10, 25, 639 A.2d 1007 (1994). Our broad prohibition of warrantless searches "reflects a goal of protecting citizens from unjustified police intrusions by interposing a neutral decisionmaker between the police and the object of the proposed search." *State* v. *Miller,* supra, 227 Conn. 382.

We turn next to the fourth and fifth *Geisler* factors, an examination of relevant precedent from federal courts and the courts of other states. The United States Supreme Court has not considered explicitly the issue of whether the consent to search of one present joint occupant can override the objection of another present joint occupant. It has considered, however, the issue of third party consent in general. *United States* v. *Matlock,* supra, 415 U.S. 164. The Supreme Court in *Matlock* concluded that a third party who had common authority over a home validly could consent to a search without the consent of the other joint occupant. Id., 169–70. The court further stated, however, that "the consent of one who possesses common authority over premises is valid as against the *absent, nonconsenting person* with whom that authority is shared." (Emphasis added.) Id., 170. The Supreme Court has not subsequently elaborated on this statement. As a result, in interpreting *Matlock,* lower courts have reached conflicting conclusions as to whether the third party consent rule applies exclusively in situations where a joint occupant is absent, based on a strict reading of the sentence in *Matlock;* see id.; or whether the consent of one joint occupant is likewise valid against another joint occupant who is present and objects to the search.

While several federal courts of appeals and state courts seemingly have favored the latter position, we note that many of those cases are distinguishable from the present case. Specifically, several cases validating

searches conducted in the face of an objection by one present joint occupant involved situations where the objecting occupant was victimizing the consenting occupant. The validity of the searches in those cases were based in part on the exigent circumstances doctrine. For example, in *United States* v. *Hendrix*, 595 F.2d 883, 884 (D.C. Cir. 1979), the police were summoned in connection with a domestic violence incident in which the defendant was beating and threatening his wife and had fired his shotgun out of a window of the couple's apartment. The defendant continued threatening his wife even in the presence of the police. Id., 885. As a result, the police arrested the defendant for disorderly conduct, and, pursuant to the consent of the defendant's wife, who was inside the home with the couple's child, the police searched the couple's home to find the shotgun. Id. The defendant had objected to the search. The District of Columbia Circuit Court of Appeals held that the search was constitutional not only because the defendant's wife consented to the search but also because the search was justified by exigent circumstances. Id.; see also *United States* v. *Donlin*, 982 F.2d 31, 33–34 (1st Cir. 1992); *People* v. *Sanders*, 904 P.2d 1311, 1313 (Colo. 1995); *Laramie* v. *Hysong*, 808 P.2d 199, 204 (Wyo. 1991). Because these decisions rely in part on the exigent circumstances rationale to validate the searches in question, we cannot conclude that they support an application of the third party consent rule to the facts of the present case, where one party did not consent to the search and no exigent circumstances existed.

In other cases, additional information offered by one joint occupant has affected the nature of the other joint occupant's consent or objection. In *United States* v. *Morning*, 64 F.3d 531, 532 (9th Cir. 1995), the defendant denied the police officers' request to search her home and replied that she preferred that they obtain a war-

rant. The officers proceeded to ask the defendant if anyone else resided in the house. She responded that her boyfriend also lived there, and she left to summon him. When the defendant's boyfriend presented himself at the door, the officers announced that they were conducting a narcotics investigation. The defendant's boyfriend then stated, " '[i]t's in the back there, but it's not mine.' " Id. The police subsequently obtained oral and written consent from the defendant's boyfriend to search the home. Id. In *United States* v. *Sumlin*, 567 F.2d 684, 685–86 (6th Cir. 1977), agents of the Federal Bureau of Investigation arrested the defendant at his apartment for a bank robbery. Following his arrest, the agents asked for the defendant's consent to search the apartment, which he refused to give. The agents then attempted to determine who owned the apartment for purposes of securing consent to search. When the defendant responded that his female companion leased the apartment, the agents sought and obtained the female companion's consent to search the property. The defendant conceded that he had told his companion that she need not withhold her consent as he had nothing to hide. The Sixth Circuit Court of Appeals concluded that *Sumlin* was governed by *Matlock* despite the defendant's argument that he initially had objected to the search. Id., 688. In both *Sumlin* and *Morning*, specific statements made by the occupants of the searched premises called into question the effectiveness of their stated consent or objection. The determination of valid consent in those cases therefore was tempered by these statements. In the present case, there is nothing in the record to indicate that either of the defendant's parents made such statements.

We find that after distinguishing many of the state and federal cases adverse to the defendant's position, few cases supporting the application of the *Matlock* rule to the present facts remain. To the extent that

other courts' decisions do not exhibit any meaningful factual distinctions, we nevertheless disagree with the broader underlying principles employed by these courts which extend the third party consent rule to situations similar to the present case. The uncertainty surrounding the scope of the *Matlock* rule has led several federal courts of appeals and state courts to extend reflexively the third party consent rule to apply in situations involving the consent of third parties without regard for the constitutional significance of extending the rule to these situations. Specifically, several courts purportedly extending the *Matlock* analysis to cases involving present objecting and consenting joint occupants simply apply the rule without any evident consideration of the propriety or constitutional implications of its applicability. See *Lenz* v. *Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995); *United States* v. *Donlin*, supra, 982 F.2d 33. The *Lenz* and *Donlin* courts both based the validity of the search in question on a single statement that "*Matlock*'s third-party consent rule applies even when a present subject of the search objects." *Lenz* v. *Winburn*, supra, 1548; see *United States* v. *Donlin*, supra, 33.

Some courts have based their application of the third party consent rule on the reasoning in *Matlock* that joint occupants "[assume] the risk that one of their number might permit the common area to be searched." *United States* v. *Matlock*, supra, 415 U.S. 171 n.7. In *People* v. *Cosme*, 48 N.Y.2d 286, 292, 397 N.E.2d 1319, 422 N.Y.S.2d 652 (1979), the New York Court of Appeals noted that "an individual who possesses the requisite degree of control over specific premises is vested in his own right with the authority to permit an official inspection of such premises and . . . this authority is not circumscribed by any 'reasonable expectation of privacy' belonging to co-occupants. Whether the principle is characterized as an 'assumption of risk' or a relinquishment of the 'expectation of privacy' guaranteed

by the Fourth Amendment, the fact remains that where an individual shares with others common authority over premises or property, he has no right to prevent a search in the face of the knowing and voluntary consent of a co-occupant with equal authority."

Several state courts, however, have rejected this broad application of the assumption of risk analysis. In addressing the applicability of *Matlock*'s assumption of risk analysis to circumstances similar to those in the present case, the Washington Supreme Court noted that "since the rule enunciated in *Matlock* only refers to 'absent, nonconsenting' persons, we must determine whether the rationale upon which *Matlock* rests is equally applicable where the defendant is present at the time of the search. Arguably, one's ability to control the premises is not subordinated to a joint occupant when one remains on the premises and is able to object to access by others." *State* v. *Leach*, 113 Wash. 2d 735, 740, 782 P.2d 1035 (1989). In *In the Matter of the Welfare of D.A.G.*, 484 N.W.2d 787, 790 (Minn. 1992), the Minnesota Supreme Court noted that "the risk that one co-inhabitant might permit the common area of a jointly occupied premises to be searched in the absence of another is qualitatively different from the risk that a warrantless search will be conducted over the objection of a present joint occupant . . . ."[9] In that case, the court noted with approval the reasoning used by Professor LaFave in his treatise that "the risk assumed by joint occupancy is merely an inability to control access to the premises during one's *absence*." (Emphasis added; internal quotation marks omitted.) Id., quoting 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 8.3 (d), p. 252. Other states also have recognized that the

---

[9] While the central issue in *In the Matter of the Welfare of D.A.G.*, supra, 484 N.W.2d 787, was the enforceability of the consent of an absent joint occupant against a present objecting joint occupant, the Minnesota Supreme Court addressed in dicta issues relevant to the present case. See id., 789–90.

assumption of risk analysis cannot, in principle, apply to present objecting joint occupants. See, e.g., *Saavedra v. State*, 576 So. 2d 953, 958 (Fla. App. 1991) ("[j]oint dominion or control provides valid consent [by one person] only when the other person is absent"); *State v. Randolph*, 278 Ga. 614, 615, 604 S.E.2d 835 (2004) ("[w]hile one co-inhabitant may have assumed the risk that a second co-inhabitant will consent to a search of common areas in the absence of the first co-inhabitant . . . the risk assumed by joint occupancy goes no further" [citation omitted]).

Professor LaFave acknowledges the division of authority on the proper interpretation of *Matlock* when one co-occupant objects and the other consents, noting that "commentators have reached conflicting conclusions on the question of whether the consent or the objection must prevail." 4 W. LaFave, Search and Seizure (4th Ed. 2004) § 8.3 (d), p. 159. He favors giving priority to the objection, noting "the point is that a person's authority to consent in his 'own right' does not go so far as to outweigh an equal claim to privacy by a co-occupant on the scene, and that the risk assumed by joint occupancy is merely an inability to control access to the premises during one's absence." Id.

We find most persuasive the reasoning in several cases that focuses on the constitutional right of the present, objecting co-occupant. See, e.g., *Silva v. State*, 344 So. 2d 559, 562 (Fla. 1977) ("a present, objecting party should not have his constitutional rights ignored . . . [due to a] property interest shared with another"); *State v. Leach*, supra, 113 Wash. 2d 744 ("[S]hould the cohabitant be present and able to object, the police must also obtain the cohabitant's consent. Any other rule exalts expediency over an individual's Fourth Amendment guarant[e]es."). Such reasoning is consistent with our strong constitutional and historical prefer-

ence for search warrants and our narrowly circumscribed exceptions to the warrant requirement, which are rooted in our history of protecting an individual's constitutional right to privacy under article first, § 7, especially with regard to privacy in the home. We therefore conclude that the fourth and fifth *Geisler* factors clearly favor the defendant's claim.

Finally, we consider the sixth *Geisler* factor, the public policy implications of adopting the defendant's position.[10] We conclude that the rule requiring the consent of both present joint occupants strikes the appropriate balance between individual liberties and police expediency. Specifically, requiring the consent of both present joint occupants for a valid consent search is consistent with our manifest preference for warrants and our well established regard for the sanctity of the home. We agree that, under *Matlock*, an *absent* joint occupant assumes the risk that a present joint occupant may permit access to shared space for a search. To extend this assumption of risk analysis to the present circumstances, however, would relegate the objecting joint occupant's constitutional rights to inferior status. Our long-standing public policy of protecting the sanctity of the home and favoring searches conducted pursuant to a warrant weighs heavily against such a result.

As is evident from our analysis of the defendant's claim under the *Geisler* factors, our own constitution, case law, constitutional history, and public policy clearly favor searches conducted pursuant to a warrant where, as in the present case, the applicability of an exception to the warrant requirement, such as consent, is ambiguous or unclear. We find most persuasive the state court decisions that limit the application of the

---

[10] We note that the defendant's claim is neutral with respect to the other elements of the sixth *Geisler* factor: economic and sociological considerations. See *State* v. *Geisler*, supra, 222 Conn. 685.

assumption of risk analysis to situations where one joint occupant is absent or unavailable when the consent to search is sought. Consequently, we determine that the *Geisler* factors, viewed together, favor the rule requiring the consent of both co-occupants when both are present to consent to a search. We therefore conclude that the search of the defendant's home violated article first, § 7, of the constitution of Connecticut and deprived the defendant of a fair trial.[11] See *State* v. *Lamme,* 216 Conn. 172, 182, 579 A.2d 484 (1990) (use of evidence obtained in violation of constitution compromises right to fair trial). The defendant therefore has satisfied the third prong of *Golding.*

We turn, finally, to the fourth prong of *Golding.* We conclude that the defendant's claim satisfies the fourth prong of *Golding* because the state has failed to demonstrate the harmlessness of the constitutional violation beyond a reasonable doubt. *State* v. *Golding,* supra, 213 Conn. 240. Having conducted a thorough review of the record, we cannot say that the illegal search in the present case was a harmless violation. The defendant's bloodstained clothing, which was discovered during the illegal search of the defendant's home, was key evidence at trial. Some of the clothing was found to contain traces of the victim's blood as determined by DNA testing.[12] A police forensic lab criminalist testified that the

[11] We emphasize that our conclusion leaves the applicability of the third party consent rule unchanged in most cases. As stated in *Leach,* "the point at which the difficult choice between consent and objection must be made is only where the occupants have equal use and control of the premises and where both are present . . . ." *State* v. *Leach,* supra, 113 Wash. 2d 741–42. Our conclusion in the present case only governs cases in which identically situated joint occupants, who are both present when consent is sought, offer conflicting responses when asked to consent to a search of their property.

[12] Specifically, three items of clothing and a towel were removed from the defendant's home during the search in question. Two items of clothing and the towel tested negative for blood. The third item of clothing, a tank top, tested positive for human blood.

DNA profile obtained from the defendant's blood-stained tank top matched exactly the DNA profile of the victim. The criminalist further stated that the probability of finding the DNA profile obtained from the bloodstained clothing in a member of the population other than the victim was less than one in three hundred million. Moreover, the defendant offered his inculpatory statement to West Haven police immediately upon being confronted with the discovery of the bloodstained clothing. Given that the bloodstained tank top, the fruit of the illegal search, connected the defendant to the victim and led to the defendant's inculpatory statement, we cannot say that the state has demonstrated the harmlessness of the illegal search beyond a reasonable doubt.

Because we determine that the search of the defendant's home was unlawful, the state's claim that the search purged the taint of the initial unlawful seizure of the defendant must fail. Specifically, the state claims in its brief that "the police acquired probable cause to arrest the defendant through independent means when they lawfully searched his parents' house and discovered his bloody clothing in their washing machine, a significant intervening circumstance which cut off any causal connection between the [initial unlawful] seizure and the confession." Our determination that the search of the defendant's home was unlawful prevents the state from relying on the search as the source of probable cause to arrest the defendant. Because the search cannot serve to purge the taint of the defendant's initial unlawful seizure, all evidence obtained as fruit of that seizure must be suppressed.

The judgment is reversed and the case is remanded for a new trial.

In this opinion SULLIVAN, C. J., concurred.

KATZ, J., concurring. In this appeal, the state does not challenge the trial court's finding that the defendant, Nicholas A. Brunetti, had been seized illegally by the police at his home and transported to the police station for interrogation in violation of his rights under the fourth amendment to the federal constitution.[1] The state contends, however, that "the connection between the unconstitutional police conduct and the confession obtained from the defendant during his illegal detention was sufficiently attenuated to permit the use at trial of the confession and other evidence related to it." Specifically, the state relies on the evidence seized from the defendant's family's home to provide the otherwise missing probable cause for his detention and arrest.[2] The state contends that, "the police acquired probable cause to arrest the defendant through independent means when they lawfully searched his parents' house and discovered his bloody clothing in their washing machine, a significant intervening circumstance which cut off any causal connection between the seizure and the confession." According to the state, therefore, the clothing served to purge the taint of the defendant's initial illegal seizure, and this court should uphold the trial court's decision to admit his confession into evidence. Finally, the state contends that the defendant confessed only after he had been confronted with the

[1] "The fourth amendment right to be free from unreasonable searches and seizures is made applicable to the states by incorporation through the due process clause of the fourteenth amendment. See *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961)." *State* v. *Mann*, 271 Conn. 300, 302 n.1, 857 A.2d 329 (2004), cert. denied, 544 U.S. 949, 125 S. Ct. 1711, 161 L. Ed. 2d 527 (2005).

[2] The state also claims that the defendant's second statement in which he confessed to the police "was sufficiently attenuated to purge any taint flowing from the illegal seizure . . . [because] the defendant received *Miranda* warnings and waived his constitutional rights in writing before he agreed to speak to the detectives about the murder." Reliance on this factor per se is insufficient. *Dunaway* v. *New York*, 442 U.S. 200, 216–19, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *State* v. *Luurtsema*, 262 Conn. 179, 191–97, 811 A.2d 223 (2002).

clothing properly seized and after he had waived his *Miranda*[3] rights, and that combined, these two factors acted as "legitimate intervening circumstances to dissipate the taint of the defendant's earlier illegal arrest." (Internal quotation marks omitted.)

Following an analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), the plurality in the present case concludes that, under the circumstances of this case, the defendant is entitled to the suppression of evidence seized from his home pursuant to the prohibition against unreasonable searches and seizures afforded by article first, § 7, of the Connecticut constitution. The plurality does not decide, however, whether the defendant could prevail under the federal constitution, concluding that "fourth amendment jurisprudence is not instructive," and, therefore, does not decide whether the state constitution affords the defendant greater protection than its federal counterpart. See footnote 7 of the plurality opinion. Because I would conclude that the warrantless search of the defendant's home was violative of the federal constitution, I write separately.[4]

---

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . [Therefore] [w]e have frequently relied upon decisions of the United States Supreme Court interpreting the fourth amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court." (Citations omitted; internal quotation marks omitted.) *State* v. *Rizzo*, 266 Conn. 171, 206, 833 A.2d 363 (2003).

I agree with the plurality that the defendant in the present case did an extensive analysis of the *Geisler* factors in briefing his state constitutional claim. The defendant did not concede, however, that he could not prevail under the federal constitution, but, rather, sought to assert claims under

## I

The defendant filed a motion to suppress the evidence seized from his family's home in West Haven, claiming that the state could not demonstrate that the consent to search the home was given voluntarily. Following a hearing on the motion, the defendant argued that the state had not proven that the *only* consent given, the one provided by his father, Anthony Brunetti, Sr., had been the product of a free and voluntary choice because his father had been influenced improperly by the police—specifically, the defendant's uncle, John Brunetti, a West Haven police detective. The trial court denied the defendant's motion and, accordingly, allowed the state to introduce into evidence the items seized during that search.

both the state and federal constitutions. Generally, when we rely solely on the state constitution, we do so when the federal constitution clearly does not afford the relief requested; see, e.g., *State* v. *Ross*, 230 Conn. 183, 248, 646 A.2d 1318 (1994) ("[t]he defendant urges us to exercise our independent authority under the state constitution to declare any imposition of the death penalty invalid as cruel and inhuman punishment because it no longer comports with contemporary standards of decency and civilization"), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); or we conduct an analysis under the state and federal constitutions together, treating the rights as coextensive. See, e.g., *Leydon* v. *Greenwich*, 257 Conn. 318, 333, 777 A.2d 552 (2001) ("we base our conclusion on the protections afforded under the first amendment to the federal constitution and article first, §§ 4, 5 and 14, of the state constitution").

Although two prongs of *Geisler* require a comparison of the treatment of the issue under the federal constitution and our sister states' constitutions to determine whether we should recognize an independent right under our constitution, none of the state court cases cited by the plurality analyzes the issue under the state constitution; rather, they treat the federal and state constitutions as providing coextensive rights or they rely solely on the federal constitution, thus providing none of the rationale for recognizing an independent right under our constitution. In the present case, because the cases upon which the plurality relies do not conduct an independent state constitutional analysis, I fail to see a persuasive justification for deviating from our normal course and deciding the issue under the state constitution alone.

On appeal, the defendant acknowledges, as he must, that at trial he did not raise the refusal by his mother, Dawn Brunetti, to consent to the search as an independent basis upon which to grant his motion to suppress. Instead, the defendant argued only that the state had not proven that the consent given by his father had been the product of a free and voluntary choice. He contends nevertheless that he is entitled to review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The plurality agrees, as do I. I believe, however, that the adequacy of the record to review the claim in this case warrants further explanation.

It is clear that the defendant's unpreserved claim raises an issue of constitutional magnitude. It is beyond dispute that one of the most fundamental propositions of our criminal jurisprudence is "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); accord *State* v. *Guertin*, 190 Conn. 440, 446, 461 A.2d 963 (1983). It is equally well settled that, "[a] warrantless search [or entry into one's home] is not unreasonable under . . . the fourth amendment to the constitution of the United States . . . if a person with authority to do so has freely consented . . . . The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so." (Citations omitted; internal quotation marks omitted.) *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988). Such consent to search may not be established by mere acquiescence to police authority. *State* v. *Jones*, 193 Conn. 70, 79, 475 A.2d 1087 (1984).

"[W]hether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. . . .

*Schneckloth* v. *Bustamonte*, [412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)]. As a question of fact, it is normally to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence." (Internal quotation marks omitted.) *State* v. *Reagan*, supra, 209 Conn. 7–8; accord *Dotson* v. *Warden*, 175 Conn. 614, 619, 402 A.2d 790 (1978). The ultimate question is whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice. *Schneckloth* v. *Bustamonte*, supra, 225–26. In reviewing the trial court's determination, we are mindful of our obligation to examine scrupulously the record concerning such matters. See *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990); *State* v. *Harris*, 188 Conn. 574, 579–80, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983).

Against this backdrop, I turn to the record and the trial court's findings in its decision regarding the search of the defendant's home. At the hearing on the motion to suppress, the defendant's father, Anthony Brunetti, related that West Haven police detectives Joseph Biondi and Anthony Buglione took the defendant to the police station and that he and his wife followed soon thereafter to wait for their son. According to Anthony Brunetti, while he and his wife were waiting at the station, they were approached by Detective James Sweetman and State Trooper Mark Testoni. Sweetman asked both of the defendant's parents to sign a form giving the police their consent to search the family's home. Sweetman explained what the form was and informed the defendant's parents that they had the right not to sign it. Anthony Brunetti testified that, when his wife was asked to sign the consent form, she "declined. She did not want to sign it." Dawn Brunetti also testified that she refused to sign the consent form.

Anthony Brunetti did sign the form, however, only after discussing the matter with his brother, John Brunetti, a West Haven police detective. According to Anthony Brunetti, he signed the form after his brother told him that if he did not sign the form, "[the West Haven police] could obtain a search warrant and possibly keep you from going back into your home until the search warrant . . . is obtained." On the basis of this testimony, the defendant argued at the suppression hearing that his father's consent did not meet constitutional standards of voluntariness because it had been given only in response to police admonitions that refusal would be futile. Specifically, the defendant contended that, under *State* v. *Jones*, supra, 193 Conn. 80, his father's consent was not voluntary because "the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant." (Internal quotation marks omitted.)

The trial court denied the defendant's motion to suppress from the bench, orally articulating the basis of its decision and making specific findings regarding the issue. Of note is the trial court's discussion rejecting the defendant's reliance on *Jones*. The court stated: "[T]his is not an issue as decided in [*Jones*], one of acquiescence to . . . a claim of lawful authority. It is not that. *It is clear that at least one of the parties* [*in the present case*], *one of the parents declined to consent to* [*the*] *search*. . . . [The defendant's father] sought information, information to decide whether or not he should sign the consent. He sought information to make an informed decision. He made it clear for the record that he knew he did not have to sign it. He made that quite clear. There was no coercion, there was no force, there was no mere acquiescence. [The defendant's father] invited comment by his brother, sought his advice as he should. [His brother is] experienced in

this area. And based upon that advice, [the defendant's father] consented to [the] search." (Emphasis added.)

In light of these factors, I would conclude that the record is sufficient for review of the defendant's claim that his mother's refusal to consent rendered the search invalid. Moreover, I disagree with the state's contention that the record merely reflects that the defendant's mother refused to sign the consent form and that such failure to sign is not tantamount to a refusal to consent. See *State* v. *Harris*, supra, 188 Conn. 580 (concluding that defendant's "expressed willingness to speak constituted an explicit affirmative act evidencing waiver [of the right to refuse consent to the search], which the court could reasonably find persuasive despite the defendant's initial refusal to sign the waiver form"). As a matter of law, a decision not to sign a consent form does not preclude a finding based on other conduct or statements that the person actually did consent. See id. Indeed, the trial court is bound to consider the totality of the circumstances. *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 227. Conversely, however, *in the absence of evidence to the contrary*, a decision not to sign a consent form reasonably may lead to a finding that the person refused to give his or her consent. In either case, we cannot disturb the trial court's finding of fact as to consent to search unless that finding is clearly erroneous. *State* v. *Cobb*, 251 Conn. 285, 315, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000).

On the basis of the totality of the circumstances of the present case, the trial court's statement that, "[i]t is clear that at least one of the parties, one of the parents declined to consent to [the] search," reflected its finding that the defendant's mother in fact had not consented, not that she merely had refused to sign the consent form. The context in which the trial court made that statement supports this conclusion because the court

prefaced the remark by distinguishing the present case from *State* v. *Jones,* supra, 193 Conn. 79–80, wherein the issue of mere acquiescence was at play. In other words, the trial court was taking the present case out of the realm of silence, inferences, mere acquiescence, submission, acceptance, tacit agreement or compliance. Accordingly, the trial court made that statement as an expression of its finding that the defendant's mother had not consented to the search.

Indeed, it is evident by comparing the trial court's discussion of Dawn Brunetti's consent or lack thereof with its discussion of Anthony Brunetti's consent that, in the trial court's view, the decision to sign or not to sign the consent form was synonymous with a decision whether to consent to the search, absent evidence to the contrary. The trial court found that Anthony Brunetti voluntarily had consented to the search of his home based solely on his decision to sign the consent form following a discussion with his brother. The trial court did not discuss consent based on conduct or verbal acquiescence. Rather, the court discussed consent only in the context of the signed form. As I previously have indicated, the court stated: "[Anthony Brunetti] sought information, information *to decide whether or not he should sign the consent.* He sought information to make an informed decision. He made it clear for the record that he knew he did not have to sign it. He made that quite clear. There was no coercion, there was no force, there was no mere acquiescence. [The defendant's father] invited comment by his brother, sought his advice as he should. [His brother is] experienced in this area. And based upon that advice, [the defendant's father] consented to [the] search." (Emphasis added.) Therefore, the only evidence the trial court pointed to as evidence of Anthony Brunetti's consent was his decision to sign the form. That decision to sign reflected his consent. Similarly, Dawn Brunetti's decision not to

sign reflected her refusal to consent to the search. The trial court's finding to that effect was not clearly erroneous in light of the record before it and its ability to observe the witnesses' demeanor.

Finally, I note that it was the state's burden to prove that the police had obtained consent to the search.[5] *State* v. *Reagan*, supra, 209 Conn. 7. To the extent that the record is not as complete as this court ideally would like, I am mindful of the defendant's efforts to perfect the record on this issue—filing a motion for an articulation on, inter alia, this issue and filing a motion for review of the trial court's denial of that motion—and the state's opposition to those efforts. Accordingly, I agree with the plurality that the record is adequate for review of the defendant's claim that the search and seizure were illegal because his mother did not consent to the search.

## II

It is well recognized that the voluntary consent of any co-occupant of a residence to search premises jointly occupied is valid against the absent co-occupant, thereby permitting evidence discovered in the search to be used against him at a criminal trial. See *Frazier* v. *Cupp*, 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969) (rejecting petitioner's claim that his cousin's consent to search of duffel bag, which was being used jointly by both men and had been left in cousin's home, would not justify seizure of petitioner's clothing found inside; joint use of bag rendered cousin's authority to consent to its search clear). In *United States* v. *Matlock*,

---

[5] To the extent, however, that the dissent claims that the state never had an opportunity to address the issue of the consent of the defendant's mother, I disagree with that assertion. Because the defendant was contesting the validity of his father's consent, the state had every incentive to prove under its theory of consent, if it could, that the defendant's mother had acquiesced to the search and, thus, that her refusal to sign the consent form had no import.

415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974), the United States Supreme Court held, therefore, that, "when the state seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." That holding is rooted in the theory that one co-occupant exercises full control of the premises in the absence of another co-occupant because we rationalize that the absent one has assumed the risk that a warrantless search will be conducted in his absence and even perhaps against his wishes.[6] Id.; see *United States* v. *Chaidez*, 919 F.2d 1193, 1202 (7th Cir. 1990) ("[t]he underpinning of third-party consent is assumption of risk"), cert. denied sub nom. *Chavira* v. *United States*, 501 U.S. 1234, 111 S. Ct. 2861, 115 L. Ed. 2d 1028 (1991). Notably, *Matlock* was premised on facts wherein the police arrested the defendant in the front yard of a house he occupied with others, did not ask the defendant for consent to search and, instead, sought and obtained consent from a co-occupant inside the house. Therefore, *Matlock* did not address the situation in which joint occupants both are present, contemporaneously are asked for their consent and give conflicting responses.

To date, the United States Supreme Court has not spoken *directly* on this issue, and other federal and state courts that have considered the issue are split

---

[6] The reasons often given to support searches conducted pursuant to a third party's consent when one co-occupant is absent or unavailable and the third party is present are that: (1) the third party is waiving his own rights and not those of the co-occupant; and (2) the co-occupant has assumed the risk that the third person will waive his constitutional rights. See *United States* v. *Matlock*, supra, 415 U.S. 171 n.7; J. Wefing & J. Miles, "Consent Searches and the Fourth Amendment: Voluntariness and Third Party Problems," 5 Seton Hall L. Rev. 211, 279 (1974).

on whether, under the federal constitution, a person present and refusing consent has a constitutionally cognizable privacy interest when another similarly situated person consents to the search. The majority view holds that consent by a co-occupant should prevail, despite the objection of a co-occupant who is present. See 3 W. LaFave, Search and Seizure (4th Ed. 2004) § 8.3 (d), p. 159. These courts have adopted this rule, at least in broad principle,[7] but, significantly, several of those cases are distinguishable in that they involved criminal conduct *by* one co-occupant *against* the other, often domestic violence.[8] Thus, under the facts in those cases, the consenting party arguably had more significant

---

[7] The following cases exemplify the majority position that consent by only one joint occupant is necessary, even when another co-occupant objects to the search. See *United States* v. *Morning*, 64 F.3d 531, 536 (9th Cir. 1995) (upholding consent by co-occupant, despite refusal to consent by defendant), cert. denied, 516 U.S. 1152, 116 S. Ct. 1030, 134 L. Ed. 2d 108 (1996); *Lenz* v. *Winburn*, 51 F.3d 1540, 1548 (11th Cir. 1995) ("*Matlock*'s third-party consent rule applies even when a present subject of the search objects"); *United States* v. *Donlin*, 982 F.2d 31, 33 (1st Cir. 1992) ("[t]hird party consent remains valid even when the defendant specifically objects to it"); *United States* v. *Hendrix*, 595 F.2d 883, 884–85 (D.C. Cir. 1979) (wife's consent prevailed over objection of husband who was arrested when he came out of apartment); *People* v. *Sanders*, 904 P.2d 1311, 1313 (Colo. 1995) ("[t]he valid consent of a person with 'common authority' will justify a warrantless search of a residence despite the physical presence of a nonconsenting co-occupant"); *People* v. *Cosme*, 48 N.Y.2d 286, 288–92, 397 N.E.2d 1319, 422 N.Y.S.2d 652 (1979) (presence of protesting occupant at scene does not invalidate co-occupant's consent); *Laramie* v. *Hysong*, 808 P.2d 199, 204 (Wyo. 1991) ("we do not perceive a constitutional significance to the refusal to consent of a co-owner or occupant who is present"); see also *United States* v. *Garcia*, 57 M.J. 716, 719–20 (N.M. Crim. App. 2002) ("the majority of appellate cases . . . tend to indicate an accused's presence and explicit refusal to consent is 'constitutionally insignificant,' so long as the consenting cotenant has equal access or control over the premises to be searched"), rev'd on other grounds and remanded, 59 M.J. 447 (A.F. Crim. App. 2004).

[8] The following cases are ones in which consent has arisen in the context of criminal activity by the nonconsenting co-occupant: *United States* v. *Donlin*, 982 F.2d 31, 32–33 (1st Cir. 1992); *United States* v. *Hendrix*, 595 F.2d 883, 884–85 (D.C. Cir. 1979); *People* v. *Sanders*, 904 P.2d 1311, 1312–13 (Colo. 1995); *People* v. *Cosme*, 48 N.Y.2d 286, 288–89, 397 N.E.2d 1319, 422 N.Y.S.2d 652 (1979).

rights at stake than the objecting, nonconsenting defendant.

The minority view, that consent of a co-occupant does *not* negate the express objection of a present co-occupant, is premised on an understanding of two related principles underlying the majority view. In accordance with the *Matlock* assumption of risk theory, "the point is that a person's authority to consent in his 'own right' does not go so far as to outweigh an equal claim to privacy by a co-occupant on the scene, and that the risk assumed by joint occupancy is merely an inability to control access to the premises *during one's absence.*" (Emphasis added.) Id. Under this view, the courts "have recognized that the assumption of risk inherent in co-occupancy has its limits. An entry or search, even though authorized by a co-occupant, may be so intrusive that it belies the conclusion that the parties assumed or even contemplated the risk of its occurrence by deciding to jointly inhabit the subject residence." *People* v. *Haskett*, 30 Cal. 3d 841, 857, 640 P.2d 776, 180 Cal. Rptr. 640 (1982). Indeed, it is reasoned that "the consent of both is required when both are present because ordinarily, persons with equal 'rights' in a place would accommodate each other by not admitting persons over another's objection while he was present." (Internal quotation marks omitted.) 3 W. LaFave, supra, § 8.3 (d), p. 159.

Under a related property based theory, an absent co-occupant assumes some risk that present co-occupants may permit others to enter the home, but only because the absent co-occupant has relinquished control over the premises by virtue of his or her absence. The California Court of Appeal has explained that, under the fourth amendment to the federal constitution, "[t]his rule of the authority of a co-occupant to give a consent to search is based upon the actual control which a co-occupant has over premises that are jointly occupied.

However, the right of control of one co-occupant over jointly occupied property which constitutes an actual authority over such property, including the authority to give the police a consent to search the premises without the concurrence of other co-occupants, is not absolute. A joint occupant's right of privacy in his home is not completely at the mercy of another with whom he shares legal possession. . . . [J]oint occupancy of property, particularly residential property, obviously demands reasonable restrictions on the right of each joint occupant either by himself or through another to exercise full control over the property at all times regardless of the wishes of another joint occupant present on the premises." (Citations omitted; internal quotation marks omitted.) *People* v. *Reynolds*, 55 Cal. App. 3d 357, 368, 127 Cal. Rptr. 561 (1976), overruled in part on other grounds by *People* v. *James*, 19 Cal. 3d 99, 106 n.4, 561 P.2d 1135, 137 Cal. Rptr. 447 (1977); *Tompkins* v. *Superior Court*, 59 Cal. 2d 65, 69, 378 P.2d 113, 27 Cal. Rptr. 889 (1963).

This same position, distinguishing between an absent and a present, objecting co-occupant, also has been adopted by the Washington Supreme Court: "Where the police have obtained consent to search from an individual possessing, at best, equal control over the premises, that consent remains valid against a cohabitant, who also possesses equal control, *only while the cohabitant is absent. However, should the cohabitant be present and able to object, the police must also obtain the cohabitant's consent.* Any other rule exalts expediency over an individual's Fourth Amendment guaranties." (Emphasis added.) *State* v. *Leach*, 113 Wash. 2d 735, 744, 782 P.2d 1035 (1989); see *State* v. *Walker*, 136 Wash. 678, 684–86, 965 P.2d 1079 (1998) (reaffirming *Leach*, but refusing to extend it to circumstances in which co-occupant is present but not asked for consent); see also *United States* v. *Impink*, 728 F.2d 1228,

1234 (9th Cir. 1984) ("We do not hold that police must invariably seek consent from the suspect before relying on a third party's consent. However, when the police intentionally bypass a suspect who is present and known by them to possess a superior privacy interest, the validity of third party consent is less certain. . . . [We] conclude that effective consent was precluded by the combined elements of this case. Where a suspect is present and objecting to a search, implied consent by a third party with an inferior privacy interest is ineffective." [Citations omitted.]). Three other states also have recognized the fourth amendment rights of a co-occupant who is present and objecting. See *State* v. *Randolph*, 278 Ga. 614, 615, 604 S.E.2d 835 (2004) (agreeing with reasoning by Washington Supreme Court in *Leach*), cert. granted, 544 U.S. 973, 125 S. Ct. 1840, 161 L. Ed. 2d 722 (2005); *Saavedra* v. *State*, 622 So. 2d 952, 956 (Fla. 1993) (joint occupant validly may consent "only if the party who is the target of the search is not present or if the party is present and . . . does not object to the search"), cert. denied, 510 U.S. 1080, 114 S. Ct. 901, 127 L. Ed. 2d 93 (1994); *Silva* v. *State*, 344 So. 2d 559, 562 (Fla. 1977) ("[t]hough a joint occupant should have authority to consent to a search of jointly held premises if the other party is unavailable, a present, objecting party should not have his constitutional rights ignored because of a leasehold or other property interest shared with another"); *Dorsey* v. *State*, 2 Md. App. 40, 43, 232 A.2d 900 (1967) (where one co-occupant was "present and expressly objected" to search, search invalid despite consent given by other co-occupant).

In a related context, the Minnesota Supreme Court has held that, when one co-occupant is present on the scene but not asked for his consent, the consent by an *absent* co-owner is not sufficient authorization to render the warrantless search constitutional. In *In the Matter of the Welfare of D.A.G.*, 484 N.W.2d 787, 790 (Minn.

1992), the court reasoned that the "waiver" and "assumption of risk" rationales behind *Matlock* do not exist when the person against whom the search is directed is present and the consenting co-occupant is not. "First, an absent third party's consent should not be used to 'waive' another individual's constitutional rights when that individual is present at the search to give or withhold consent in his or her own right. Similarly, the risk that one co-inhabitant might permit the common area of a jointly occupied premises to be searched in the absence of another is qualitatively different from the risk that a warrantless search will be conducted over the objection of a present joint occupant: A present, objecting joint occupant cannot be said to have assumed the risk that an absent third party will vicariously waive his or her constitutional rights." Id. The court concluded that, "in a competition between an absent cotenant's right to consent to a search and another cotenant's constitutional right to be free from that warrantless search, the constitutional right must prevail. In this case, [the co-occupant's] consent to search was subordinate to [the defendant's] right to object to that search because [the defendant] was present and able to object to the warrantless search." Id.

The present case does not involve a search pursuant to the consent of one absent co-occupant and silence by another co-occupant present at the scene. Nor does it involve the consent of one co-occupant and silence by another co-occupant, both present at the scene.[9] In other words, we are not faced with the situation in which both co-occupants are present but only one consents while the other remains silent. The issue here is

---

[9] Therefore, the present case does not require that we decide whether, when one co-occupant has consented, the police actively must seek to obtain the consent of *all* occupants present on the premises. Cf. *State* v. *Walker*, supra, 136 Wash. 2d 684–85 (rejecting fourth amendment claim when police did not seek consent of present co-occupant).

whether, when one co-occupant *refuses* to consent, the co-occupant who consents has the right to override and, in essence, waive the constitutional rights of the other nonconsenting co-occupant. Out of necessity, we rationalize that an absent co-occupant has assumed the risk that a warrantless search will be conducted in his absence and even perhaps against his wishes. Under such circumstances, I agree with the general principle that when people have joint access and control over property, "it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States* v. *Matlock*, supra, 415 U.S. 171 n.7. The risk of leaving a co-occupant in control of the premises is qualitatively different, however, from the risk that a co-occupant will permit a warrantless search to be conducted *over the objection* of a present joint occupant. Indeed, it is difficult to ascertain from what act a person might infer an assumption of risk when that person has not relinquished control over the premises by his or her absence and actively has asserted a refusal to consent to the search. It similarly is questionable that a co-occupant assumes the risk that the police unlawfully will seize and remove him from his home, thereby precluding him from having an opportunity to object to a search therein, as in the present case.

Surely, in the present case, the assumption of risk cannot be found by virtue of the marital bond between the defendant's parents. Indeed, when two persons have forged a marital bond, as in this case, they retain their individual constitutional rights. One *could* argue that they remove any and all boundaries between them—in other words, that spouses surrender all privacy or other individual interests with respect to one another. "Some might [even] argue that this represents the ideal in marriage, and perhaps they are right. But although marriage

may be the most intimate of all human relations, this ideal does not reflect reality, either in practice or in the eyes of the law (e.g., prenuptial agreements, community property exemptions for property obtained prior to marriage). Not all spouses share everything with their mates, which is another way of saying that spouses do not surrender every quantum of privacy or individuality with respect to one another." *United States* v. *Duran,* 957 F.2d 499, 504 (7th Cir. 1992). When persons are co-occupants, there obviously must exist reasonable demands and restrictions on each person's right to exercise full control over the property at all times regardless of the wishes of another co-occupant present on the premises. A co-occupant's right of privacy in his home cannot, however, be completely at the mercy of another with whom he shares legal possession. Although one co-occupant may follow the lead of the other when she or he objects so that the joint occupants can act collectively, the protection of constitutional rights should not depend on mere accommodation.[10]

Therefore, I would decide the issue left open in *Matlock* and conclude that, under the federal constitution, a consent to search given by one co-occupant is invalid as against the other when both are on the scene and one has refused to consent. In my view, the courts that have sanctioned consent searches even when a co-occupant is present and objecting are unpersuasive because they invoke the third party consent doctrine from *Matlock* without properly considering a significant

---

[10] As one commentator has noted, the point at which the difficult choice between consent and objection must be made is only where the occupants have equal use and control of the premises and where both are present. "When two or more persons have equal use of a place in which both are present, the consent of one does not normally eliminate the need for the consent of the other(s) before a search is made; ordinarily, persons with equal 'rights' in a place would accommodate each other by not admitting persons over another's objection while he was present." L. Weinreb, "Generalities of the Fourth Amendment," 42 U. Chi. L. Rev. 47, 63 (1974–1975).

distinction in that case—that the nonconsenting co-occupant was *absent*, albeit involuntarily, and thereby assumed the risk of the search. See *State* v. *Leach*, supra, 113 Wash. 2d 742–43. I am persuaded by the reasoning that "the person whose property is the object of a search should have controlling authority to refuse consent. . . . Though a joint occupant should have authority to consent to a search of jointly held premises if the other party is unavailable, a present, objecting party should not have his constitutional rights ignored because of a leasehold or other property interest shared with another." (Citation omitted.) *Silva* v. *State*, supra, 344 So. 2d 562; accord *Tompkins* v. *Superior Court*, supra, 59 Cal. 2d 69. In other words, the ability to control access to one's home should not be subordinated to a co-occupant *when one remains on the premises and is able to object to access by others*. Therefore, when the police have obtained consent to search from an individual possessing control over the premises, that consent remains valid against a co-occupant only while the co-occupant is absent. If, however, the co-occupant should be present and objects, the police must obtain a warrant. Any other rule truly would "[exalt] expediency over an individual's Fourth Amendment guarant[e]es." *State* v. *Leach*, supra, 744.

Accordingly, I concur with the plurality that the express denial of consent in this case by the defendant's mother rendered the search illegal. I similarly concur that "by demonstrating his own legitimate expectation of privacy and challenging the search based on his mother's refusal to consent, the defendant is not vicariously asserting his mother's constitutional rights, but, rather, is vindicating his own." See footnote 4 of the plurality opinion. It is axiomatic that "[u]nder the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 42, 836

A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); *State* v. *Santos*, 267 Conn. 495, 511, 838 A.2d 981 (2004). As the defendant properly asserts, the fruits of the illegal search include "all seized items; all observations made at the house, including testimony about the contents of [the] defendant's bedroom . . . all testimony and evidence about the laboratory testing of the seized items; all statements made by [the] defendant subsequent to the search; and the clothing, necklace, and photographs that were taken after the defendant's (illegal) arrest." Therefore, the clothing should have been suppressed.

### III

There are, however, further ramifications of the determination that the search was illegal. In this case, the state agrees that the defendant's seizure was illegal because it was not supported by probable cause. Therefore, the state must demonstrate that the defendant's second inculpatory statement to the police, a fruit of that illegality, was purged of the taint.[11] Indeed, it was incumbent on the trial court to determine whether the defendant's second statement should have been suppressed as a consequence of the illegal seizure.

Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. *State* v. *Reynolds*, supra, 264 Conn. 42. "Application of the exclusionary rule, however, is not automatic. [E]vidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint . . . ." (Internal quotation marks omit-

---

[11] The state has argued not only that the evidence seized during the search of the family's home was properly admitted, but it also has argued that the seized clothing provided probable cause for the defendant's arrest, which in turn purged the taint of his unlawful seizure, thereby allowing the trial court properly to admit his confession into evidence.

ted.) *State* v. *Brocuglio*, 264 Conn. 778, 787, 826 A.2d 145 (2003). "[N]ot all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which [the] instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Internal quotation marks omitted.) *State* v. *Spencer*, 268 Conn. 575, 599, 848 A.2d 1183, cert. denied, 543 U.S. 957, 125 S. Ct. 409, 160 L. Ed. 2d 320 (2004). "The initial determination is, therefore, whether the challenged evidence is in some sense the product of illegal government activity. *United States* v. *Crews*, 445 U.S. 463, 471, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980); see also *State* v. *Miller*, 29 Conn. App. 207, 216, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993) ([b]ecause the seizure of the gun did not owe its origin in material part to the [illegal] *Terry* stop, the *Terry* stop cannot provide a basis for excluding the gun from evidence)." (Internal quotation marks omitted.) *State* v. *Hammond*, 257 Conn. 610, 627, 778 A.2d 108 (2001).

In the present case, because the clothing seized from the defendant's family's home should have been suppressed, it cannot serve as a significant intervening circumstance to cut off any causal connection between the seizure and the confession. In other words, the seizure of the clothing does not provide the probable cause needed to support the defendant's initial illegal seizure. Because the defendant's statement was the fruit of that illegality, and because the state could not demonstrate that the illegal seizure of the defendant's person and his resulting statements were sufficiently attenuated so as to render his second statement admissible, its suppression was required. *State* v. *Northrop*, supra,

213 Conn. 413 ("[i]t is well established that statements obtained through custodial interrogation following the seizure of a person without probable cause, in violation of the fourth amendment, should be excluded unless intervening events break the causal connection between the arrest and the confession"); see also *Taylor* v. *Alabama*, 457 U.S. 687, 690, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982); *Dunaway* v. *New York*, 442 U.S. 200, 216, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown* v. *Illinois*, 422 U.S. 590, 600–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). Accordingly, I concur with the plurality that the trial court improperly failed to suppress the defendant's statement, as well as his clothing.

PALMER, J., with whom ZARELLA, J., joins, dissenting. The plurality today reverses the murder conviction of the defendant, Nicholas A. Brunetti, on the basis of an egregious misapplication of the first prong of *State* v. *Golding*, 213 Conn. 233, 239, 567 A.2d 823 (1989),[1] thereby achieving a result that is both wholly unwarranted and grossly unfair to the state.[2] Specifically, the plurality concludes that the record is adequate for review of the defendant's unpreserved constitutional challenge to the consent search of the home in which he resided even though: (1) the state never had the opportunity to contest the finding upon which that claim is predicated, namely, that the defendant's mother objected to the search; and (2) the only fact in the

---

[1] In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[2] My comments in this dissent also are applicable to the concurring opinion. When necessary, however, I address the concurring opinion separately.

record upon which the plurality relies in making that finding, namely, the defendant's mother's refusal to sign the consent to search form, is patently insufficient to support such a finding. Lacking any logical basis to conclude that the record is sufficient for our consideration of the defendant's claim, the plurality engages in no meaningful analysis of that threshold issue, resorting, instead, to conclusory assertions and makeweight arguments regarding the adequacy of the record. Because it is impossible to determine, due to the insufficiency of the record, whether the defendant's mother objected to the search, the plurality's finding of a constitutional violation—predicated as it is on that undeveloped and altogether inadequate record—is founded entirely on guesswork and speculation. Moreover, the plurality also fails to articulate why the defendant is entitled, under the new constitutional principle that it announces, to invoke his mother's purported objection to the search. For these reasons, and because the defendant's other claims are without merit, his murder conviction should be affirmed. Accordingly, I dissent.

## I

Because the plurality's reversal of the defendant's murder conviction hinges on the resolution of the defendant's unpreserved constitutional claim, I address that issue first. Contrary to the conclusion of the plurality, the record is patently inadequate for appellate review of the merits of that claim.[3]

---

[3] I note, preliminarily, that the plurality's explication of the state constitutional principle that it adopts today—a principle that the defendant himself acknowledges is representative of the distinct minority view—is not clear because the plurality uses different standards in articulating that principle. For example, the plurality states that the "Connecticut constitution requires that the police . . . obtain the consent of all joint occupants who are present when consent is sought in order for a search by consent to be valid." The plurality also states "that the *Geisler* factors, viewed together, favor the rule requiring the consent of both co-occupants when both are present to consent to a search." Yet, the plurality states that its "conclusion . . . only governs cases in which identically situated joint occupants, who are both

## A

The following additional factual and procedural background is necessary to a complete understanding of why the plurality's conclusion regarding the adequacy of the record is so fundamentally flawed. The defendant filed motions to suppress certain bloody clothing belonging to him that the police had discovered during their search of the home in which he resided, as well as the confession that the defendant had given to the police, after his arrest, detailing his vicious and lethal attack upon the victim.[4] In support of his motions, the

---

present when consent is sought, offer conflicting responses when asked to consent to a search of their property." Footnote 11 of the plurality opinion. Although the cases and commentators upon which the plurality relies take the position that the consent of one occupant who is present does not trump the rights of a second occupant who also is present and *has objected to the search*, the plurality sometimes states its constitutional principle in broader terms, that is, that the state is required to obtain the consent of all joint occupants who are present, regardless of whether they offer conflicting responses to the request to consent. This is not a trivial distinction because, first, law enforcement authorities need to know how lawfully to comport themselves, and second, under the broad language of the plurality opinion, an occupant who simply acquiesces in the consent of a joint occupant nevertheless would be entitled to the suppression of the fruits of the otherwise lawful, ensuing search. The concurring justice recognizes this distinction in concluding that "a consent to search given by one co-occupant is invalid as against the other when both are on the scene *and one has refused to consent.*" (Emphasis added.) Indeed, the defendant, himself, casts his claim in similar terms, asserting that his "father's consent [cannot] 'triumph' over [his] mother's contemporaneous *refusal to consent.*" (Emphasis added.) In any event, as I explain subsequently in this opinion, the record is inadequate to address the defendant's unpreserved claim no matter how broadly or narrowly it is characterized by the plurality.

[4] The defendant inflicted several potentially fatal injuries to the victim, including blunt trauma to the head resulting in bruising to the brain, blunt injury manual strangulation to the neck resulting in fracturing of the hyoid bone, and blunt trauma to the chest and abdomen resulting in fractured ribs and a laceration of the spleen. In his statement to the police, the defendant revealed how he had inflicted these injuries on the victim. The defendant explained that, on the night of the murder, he was walking near Campbell and Main Streets in West Haven when the victim, a white female unknown to the defendant and subsequently identified as Doris Crain, approached the defendant and asked him if he had any marijuana. The

## defendant claimed, inter alia, that the confession was

defendant did have one marijuana cigarette, and he and the victim went behind the Washington Avenue Magnet School to smoke it.

When they finished the marijuana cigarette, the defendant and the victim began kissing and eventually engaged in sexual intercourse. At some point, the victim told the defendant that she wanted to stop because he was hurting her. The defendant, however, continued to engage in sexual intercourse with her, subsequently ejaculating inside her. The victim was very upset with the defendant and told him that she intended to call the police.

The defendant's statement to the police contains the following account of what transpired next. "At this point, I got scared because I knew that I was on probation all ready [sic] and did not want to go back to jail. As the girl stood up, I grabbed her from behind and used both hands to put her in a choke hold. One arm was wrapped around her neck and my other arm/hand was pushing on her neck. My intention at this point was to kill her so she could not tell anybody what happened. I continued to choke the girl out by placing her to the ground and wrapped [sic] my legs around her. As we went to the ground I went down first and she fell on top of me. At this point, the girl was gurgling and was trying to catch her breath.

"I thought the pressure I was applying was enough to kill her but she was still alive. I then threw her off me and she was laying [sic] on her back, and she was still making a gurgling sound.

"I then took my left hand and put my thumb into her throat area and was digging into her throat. At the same time, I punched her in the jaw with my right hand. I also used a 'hammer' fist punch and struck the girl in the skull area of the head. I don't know where she was bleeding from but there was a lot of blood. After all this punching and choking I believed that she was still alive. I also kicked the girl with the heel of my boot in the stomach. The girl somehow reacted to this and flipped on her stomach.

"I then proceeded to drag the girl by her hair for a short distance. The girl's hair started to pull out so I stopped dragging her in this manner. I then grabbed the girl by her feet and dragged her into the high grass. When I got into the high grass the girl continued to grasp [sic] for air. I left the girl in the woods and saw an Olde English 40 [ounce beer] bottle (empty) that I had drank [sic] earlier in the day. I picked up the 40 [ounce] bottle and returned to the girl. I began to hit the girl with the 40 [ounce] bottle at least six times in the head. As I was striking the girl blood was flying in the air and getting all over my clothes. After hitting the girl all these times, she continued to gurgle, but I figured she had to be dead.

"I then threw the 40 [ounce] bottle to the right side of the girl's body. I returned to where the girl's pants and shoes were and threw them in the same vicinity as the beer bottle.

"I then proceeded to leave the school by the picnic table and play area. When I reached the area, I saw several people rolling a 'blunt' (marijuana). I recognized these people as: Jerrell, Big Mike, and Fat Cat. I only know these people by their street names. As I walked by them Jerrell said 'What

the product of an illegal search of his home because, he alleged, the police had not obtained valid consent to search the home.[5] His sole argument in support of that claim was that his father's consent was not voluntary even though his father had signed a form indicating that he "knowingly, willingly and voluntarily" consented to the search "after having been informed of [his] [c]onstitutional right not to have a search performed without a search warrant and of [his] [c]onstitutional right to refuse to consent to such a search . . . ." At no time did the defendant suggest that the state also was required to obtain his mother's consent to search the house.[6] In fact, defense counsel expressly advised the court that, although the defendant's mother had declined to sign the consent to search form, the defendant was not claiming that her refusal to do so rendered the search unlawful.

At the suppression hearing, defense counsel adduced testimony from several witnesses,[7] including the defen-

---

up it's Nick Brunetti.' I said 'What up' and continuing [sic] walking. I did not want to stop because I was covered in blood and I did not want them to know that I had just killed a girl behind the school."

Shortly after giving this statement, the defendant provided an addendum to it. The addendum provides in relevant part: "[W]hen I was choking the girl my silver scorpion [pendant] got caught in the girl's hair. I did not realize that I lost the pendant until this morning. I usually wear the pendant on my silver link necklace."

[5] The defendant maintained that his confession was the product of the allegedly unlawful search of his home because he gave the confession after being told of the bloody clothing that the police had discovered during their search of the home. At trial, the state established that at least one such article of clothing, a tank top, contained DNA identical to the DNA of the victim.

[6] As the plurality has explained, the defendant's mother and father were together at the police station, waiting for the defendant, when the police approached them to seek consent to search the family home.

[7] Although the state bears the burden of establishing the voluntariness of a consent to search; e.g., State v. Cobb, 251 Conn. 285, 315, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); the suppression hearing in the present case commenced with the presentation of evidence by the defendant rather than by the state. Indeed, the state

dant's father and mother.[8] Defense counsel sought to establish, inter alia, that the father's consent to search the family home was invalid, notwithstanding the signed consent to search form, because John Brunetti, a detective with the West Haven police department and the brother of the defendant's father, improperly induced the father to agree to the search. On direct examination, the defendant's father testified about the circumstances surrounding his signing of the consent to search form. During his examination of the defendant's father, defense counsel asked: "Okay. And when you were asked to sign that [form]—by the way, was your wife asked to sign it also?" The defendant's father answered: "Yes, they asked if we would sign it, and my wife declined. She did not want to sign it." Following that brief digression regarding the defendant's mother's unwillingness to sign the form, defense counsel resumed his questioning of the defendant's father about what had led *him* to sign the form.[9] Defense counsel did not ask the defendant's father any further questions regarding the defendant's mother's refusal to sign the form. On cross-examination, the senior assistant state's attorney asked the defendant's father a few questions but none concerning the circumstances surrounding the defendant's mother's refusal to sign the consent to search form.

The defendant's mother also testified briefly at the suppression hearing. In response to defense counsel's question regarding whether she signed the consent to

called no witnesses, relying, instead, on its cross-examination of the defendant's witnesses.

[8] The other witnesses whom the defendant called to testify at the suppression hearing were Joseph Biondi and James Sweetman, both detectives employed by the West Haven police department, and Anthony Buglione, a detective with the major crime unit of the Connecticut state police. The defendant also testified at the hearing.

[9] Among other things, the defendant's father indicated that, upon consenting to the search, he and his wife went back to their home to let the police in.

search form, the defendant's mother answered, "No, I did not." Defense counsel elicited no other testimony from the defendant's mother regarding the issue of her refusal to sign the form, and the senior assistant state's attorney's brief cross-examination of the mother included no questions on that subject.[10]

The next day, immediately before trial commenced, the court issued a ruling from the bench on the defendant's motions to suppress. After finding that the defendant was in police custody when he was questioned by the investigating officers, the court addressed the defendant's claim that the search of his home was illegal. The court rejected the defendant's claim, concluding that the defendant's father's consent to search was knowing and voluntary and, therefore, constitutionally valid. During its brief explanation of its ruling on that issue, the court referred to *State* v. *Jones*, 193 Conn. 70, 475 A.2d 1087 (1984), a case upon which the defendant had relied and in which we had explained that the mere acquiescence to a claim of lawful authority by the police is not enough to establish valid consent.[11] Id., 79. Although stating that the present case did not pre-

---

[10] The defendant's mother did indicate that she may have offered to make coffee for the police officers while they were conducting the search.

[11] In *Jones*, the defendant, Reginald Jones, was residing with his father and stepmother when he became a suspect in the murder of a teacher at a high school in New Haven. *State* v. *Jones*, supra, 193 Conn. 73, 77. The police executed two separate consent searches of the family home, one predicated on the consent of Jones' father and the other on the consent of his stepmother. Id., 77–78. Jones challenged the voluntariness of each such consent and adduced testimony from his father and stepmother that they had given their consent to search only because the police had led each of them to believe that a warrant inevitably would be issued if they declined to do so. See id., 78. In denying Jones' motion to suppress certain physical evidence, the trial court rejected that testimony, however, crediting, instead, the contrary testimony of certain police officers. See id., 77, 78–79. We concluded that the trial court reasonably had credited the testimony of the state's witnesses and, therefore, rejected the defendant's claim on appeal that the trial court improperly had concluded that the searches were lawful. See id., 80–81.

sent such a scenario, the court added: "It is clear that at least one of the parties, one of the parents, declined to consent to [the] search."[12]

The case then proceeded to trial. At the conclusion of the trial, the jury found the defendant guilty of murder,[13] and the trial court sentenced him to sixty years

---

[12] The following is the court's ruling on the defendant's motion to suppress with respect to the issue of whether the consent search was illegal: "Regarding the consent to search, counsel—and I must place on the record that perhaps one reason for the state's . . . [request for an immediate ruling on the suppression issues] was that the [state] had provided me at least a day or so earlier with the applicable case law in every aspect of the issue regarding voluntariness and custody as deemed appropriate for this issue. And the court—and also defense counsel as well provided the court with the case law. This is a courtroom of law. We are confined and operate in accordance with the law.

"Now in [State v. Jones, supra, 193 Conn. 70], cited by [defense counsel] in support of [the defendant's] . . . motion to suppress the evidence in regard to the consent offered by the parents such as it was before the court, the court heard the evidence and indeed ordered the transcripts last night, and they were presented to the court this morning. The court distinguishes this case from [Jones]. It is clear to the court that this is not an issue as decided in [Jones], one of acquiescence to a lawful—to a claim of lawful authority. It is not that. It is clear that at least one of the parties, one of the parents, declined to consent to [the] search.

"This was conducted at the police station. [The defendant's father's] brother is an officer. And, as he did, he sought information, information to decide whether or not he should sign the consent [form]. He sought information to make an informed decision. He made it clear for the record that he knew he did not have to sign it. He made that quite clear. There was no coercion. There was no force. There was no mere acquiescence. He invited comment by his brother, sought his advice, as he should. He's experienced in this area. And based upon that advice, he consented to [the] search.

"There is no issue of whether or not he had authority to consent to the search of the defendant's bedroom, and it's been an issue before [the] court, and that's been satisfied. So, in regard to the search, the court finds that the consent to search was given knowingly and voluntarily. And the court is mindful of the fact that our courts look for warrants, [encourage] the use of warrants when going to persons' homes in our country pursuant to our constitution. This is a matter where the consent to search was given freely . . . [and] voluntarily. It was not a product of coercion, [express] or implied. That motion is denied."

[13] The defendant testified in his own defense at trial. In that testimony, he disavowed the truth of the detailed confession that he had given to the police on the day following the murder, claiming, instead, that his confession was the product of police threats and intimidation. He further maintained

in prison. The trial court also sentenced the defendant to six months imprisonment after having held him in contempt for physically attacking his attorney, in the courtroom and in the presence of the court, when the jury returned its verdict of guilty.

During the pendency of his appeal, the defendant filed a motion for articulation with the trial court in which he informed the court that, on appeal, he intended to challenge the propriety of the court's rulings on his suppression motions. In his motion for articulation, the defendant, who then was represented by appellate counsel in lieu of trial counsel, requested that the court "articulate the factual bases of its decision with respect to" five specific questions, including the following: "Did the defendant's mother . . . decline to give her consent for a search of the house?" "Did the trial court credit the testimony of the defendant's father . . . with regard to the circumstances surrounding his signing of the consent to search form?"[14] The state

that the victim actually had been killed by four members of a cult known as the "Black Dragon" cult. According to the defendant, on the night of the murder, he met the four men, two of whom testified for the state that they had seen the defendant emerge from the wooded area where the murder of the victim had been committed. The defendant maintained that the men took him to the victim's body, where the defendant took off his sweatpants. According to the defendant, one of the cult members then "dipped the [defendant's] sweatpants in the [victim's] blood." The defendant explained that, because of the heat, he previously had taken off his tank top and placed it in the pocket of his sweatpants. The defendant put his sweatpants back on and proceeded home, where he told his father that he had gotten blood on himself while attempting to defend against three unidentified assailants who had tried to rob him. The defendant's trial testimony regarding the events surrounding the killing of the victim, which the jury plainly rejected as a contrivance, purported to explain how the victim's blood had found its way onto the defendant's clothing.

[14] The other three questions for which the defendant sought an articulation were: 1. "At what point in time did the police have probable cause to arrest the defendant?" 2. "Did the police seize or obtain clothing and jewelry from the defendant in the early evening hours of June 24, 2000, shortly after they arrived at the defendant's house?" 3. "Were the defendant's parents allowed to talk to the defendant at the police station, while he was being interrogated?"

opposed the defendant's motion. With respect to the defendant's request for further articulation as to whether the defendant's mother had "decline[d] to give her consent for a search of the house," and as to whether the court had credited the defendant's father's testimony, the state responded that "[a] trial court's denial of a motion to suppress includes implicit findings that the trial court resolved any factual disputes, including any credibility determinations and any conflicts in testimony, in a manner which supports the trial court's ruling. . . . The defendant will have every opportunity to argue, if he so chooses, that there was *insufficient* evidence of consent presented at the suppression hearing to support the trial court's ruling that the search was consensual. However, assuming [that] the defendant cannot make such an argument because there *is* sufficient evidence to support such a finding, the defendant has failed to demonstrate that it is necessary for the trial court to articulate the specific portions of testimony which were credited and/or discredited in reaching [its] conclusion."[15] (Citations omitted; emphasis in

---

[15] I note that the defendant's motion for articulation contains no suggestion that the defendant was seeking to raise any issue on appeal that he had not raised in the trial court. Nevertheless, the concurring justice states that she is "mindful of the defendant's efforts to perfect the record on [the] issue [of the validity of consent]—*filing a motion for an articulation on . . . this issue* and filing a motion for review of the trial court's denial of that motion—and the state's opposition to those efforts." (Emphasis added.) This statement is, at best, misleading. As I explained previously, it is true that the defendant did seek to have the trial court render a further articulation in regard to whether the defendant's mother had "decline[d] to give her consent for a search of the house." Contrary to the suggestion of the concurring justice, however, the defendant's motion for articulation did not indicate that the defendant was raising, or intended to raise, any new "issue" regarding the validity of the consent to search. In any event, even if the defendant had sought to raise a new issue regarding the validity of the consent to search in his motion for articulation, it is axiomatic that a trial court is under no obligation to render an articulation on a claim that had not been raised before it. See Practice Book § 66-5 (articulation appropriate when further facts are necessary for proper presentation, on appeal, of "the issues raised" in trial court); see also *Cable* v. *Bic Corp.*, 270 Conn. 433, 444–45, 854 A.2d 1057 (2004) ("[p]roper utilization of the motion for articulation

original.) The trial court denied the defendant's motion for articulation.

The defendant then filed with this court a motion for review of the trial court's denial of his motion for articulation. For the first time in that motion, the defendant explained that, "[o]n appeal, [appellate] counsel will seek to raise the claim that when two persons with equal authority to consent to a search of a residence, are *both present* when the police seek consent, the 'consent' given by one party should not prevail over the 'refusal' to consent by the other party." (Emphasis in original.) In support of his motion, the defendant candidly conceded not only that the evidence he presented regarding his mother's refusal to consent was "never rebutted or contradicted" by the state, but also that the state's failure to challenge this evidence is insufficient to demonstrate that those facts were admitted or otherwise undisputed by the state.

The state opposed the defendant's motion for review. The state argued that, "although the defendant now explains more precisely the purpose of his claimed need for an articulation as to the mother's willingness to consent . . . he is making improper use of a motion for articulation to obtain an answer to a factual question which simply cannot be answered on the basis of the testimony presented below. It would, in fact, be clear error for the trial court to find that there was sufficient

---

serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision" [internal quotation marks omitted]). Indeed, to conclude otherwise would lead to the absurdity of requiring a trial court to assist in its own ambuscade by the defendant. Thus, even if the defendant *had* explained his reason for seeking an articulation regarding the defendant's mother's unwillingness to sign the consent to search form, that reason would have provided a wholly insufficient basis for the court to have granted the defendant's motion for articulation. Moreover, for the reasons I discuss more fully hereinafter, the record of the suppression hearing was inadequate for an articulation on that issue because the facts adduced at the hearing were insufficient for any such articulation.

evidence in this record that the defendant's mother refused to consent to the search. The portions of the transcript cited by the defendant do not support this claim. In both instances, the defendant's father and mother merely testified that the mother declined to *sign the consent form* presented to her and that it was the father who signed it. . . . No follow-up questions were asked exploring the reasons for the mother's declination to sign and whether she, in fact, was expressing her lack of consent. Just as a suspect's mere refusal to sign a *Miranda*[16] waiver form is not, by itself, evidence sufficient to undermine a finding that the suspect knowingly and voluntarily agreed to waive his rights and talk to police . . . any finding by the trial court that the mother 'refused to give consent for the search' would be purely speculative in light of the scant record below." (Citations omitted; emphasis in original.) The state further argued that the defendant "should not be permitted to utilize a motion to articulate in a belated attempt to fashion a one-sided record for *Golding* purposes." "Of course, simply obtaining a new finding of fact by way of a motion for articulation does not mean that the record upon which the trial court is being asked to make that new finding is 'adequate' [for *Golding* purposes] if the state was without notice that it should address a particular issue with the witnesses below." This court agreed to entertain the defendant's motion for review but denied the relief requested, namely, the issuance of an order requiring the trial court to articulate the bases for certain aspects of its rulings on the defendant's motions to suppress.

### B

With this background in mind, I turn to the applicable legal principles. In *State* v. *Golding*, supra, 213 Conn. 239–40, this court set forth four conditions that a defen-

---

[16] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

dant must satisfy before he may prevail, on appeal, on an unpreserved constitutional claim. See footnote 1 of this opinion. Because a defendant cannot prevail under *Golding* unless he meets each of those four conditions, an appellate court is free to reject a defendant's unpreserved claim upon determining that any one of those conditions has not been satisfied. See, e.g., *State* v. *Kirk R.*, 271 Conn. 499, 506 n.12, 857 A.2d 908 (2004). Indeed, unless the defendant has satisfied the first *Golding* prong, that is, unless the defendant has demonstrated that the record is adequate for appellate review, the appellate tribunal will not consider the merits of the defendant's claim. See, e.g., *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004) (first and second prongs of *Golding* "involve a determination of whether the claim is reviewable"), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005). In the present case, I focus on the first *Golding* prong because, contrary to the conclusion of the plurality, the defendant clearly and unequivocally has failed to satisfy that prong.

Before applying that first *Golding* requirement to the facts of this case, it bears noting that *Golding* is a narrow exception to the general rule that an appellate court will not entertain a claim that has not been raised in the trial court. The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party. E.g., *State* v. *Sandoval*, 263 Conn. 524, 556, 821 A.2d 247 (2003). Nevertheless, because constitutional claims implicate fundamental rights, it also would be unfair automatically and categorically to bar a defendant from raising a meritorious constitutional claim that warrants a new trial solely because the defendant failed to identify the violation below. *Golding* strikes an appropriate balance between these competing interests: the defendant may

raise such a constitutional claim on appeal, and the appellate tribunal will review it, but only if the trial court record is adequate for appellate review.[17] The reason for this requirement demands no great elaboration: in the absence of a sufficient record, there is no way to know whether a violation of constitutional magnitude in fact has occurred.[18] Thus, as we stated in *Golding*, we will not address an unpreserved constitutional claim "[i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . ." *State* v. *Golding*, supra, 213 Conn. 240. For the reasons that I set forth in part I D of this opinion, that is precisely—and inarguably—the state of the record in the present case.

C

Before I explain why the record is inadequate for our review of the defendant's unpreserved claim, it is useful first to summarize why the plurality concludes otherwise. The plurality's conclusion is predicated on its determination that the record demonstrates that the defendant's mother affirmatively refused to consent to the search. This conclusion is based solely on: (1) the testimony of the defendant's father that his wife declined to sign the consent to search form; (2) the testimony of the defendant's mother that she did not sign the form; and (3) the statement made by the trial

[17] In concluding that appellate review of such a claim is appropriate, this court has noted the exceptional circumstances that warrant that review. See *State* v. *Golding*, supra, 213 Conn. 238–39.

[18] Of course, if the record is inadequate for review, *Golding* prohibits a reviewing court from remanding to the trial court for the purpose of supplementing the record. Indeed, that is what the first prong of *Golding* was designed to avoid. *State* v. *Medina*, 228 Conn. 281, 301, 636 A.2d 351 (1994); *State* v. *Stanley*, 223 Conn. 674, 689–90, 613 A.2d 788 (1992). A contrary rule would promote ceaseless litigation by discouraging parties from raising claims in a timely manner, thereby seriously undermining the efficient administration of justice. I note that, consistent with this well founded rule, neither party in the present case has sought such a remand.

court in the course of its oral ruling on one of the defendant's motions to suppress that "one of the parents . . . declined to consent to [the] search." On the basis of this record, the plurality concludes that "the record is sufficiently clear and unambiguous and contains the factual background necessary for review of the defendant's claim. Specifically, the trial court's finding that '[i]t is clear that at least one of the parties, one of the parents, declined to consent to [the] search' indicates that the defendant's mother refused to agree to a search of her home, which she owned jointly with her husband. . . . It is precisely this finding which perfects the record for review." In rejecting the state's argument that the record is inadequate for review "because the defendant's mother did not expressly 'object' to the search," the plurality states: "The adequacy of the record cannot turn, without more, on the mere choice of words used by witnesses or the trial court. . . . We decline to usurp the trial court's role as the fact finder by ascribing undue significance to the precise formulation of this testimony. The trial court observed firsthand the demeanor of the defendant's parents when they testified and was best situated to evaluate the overall tenor of their testimony. On the basis of its observations, the trial court found that the defendant's mother 'declined to consent to the search.' On appeal, we are called upon to determine only whether this record is unclear or ambiguous, and three members of this court find that it is not." (Citations omitted.) The foregoing passage constitutes the entirety of the plurality's analysis of the preservation issue. I turn now to the reasons why the plurality's conclusion regarding the adequacy of the record is palpably erroneous.

## D

It is undisputed that the only evidence adduced at the suppression hearing regarding the position that the defendant's mother had taken with respect to the search

was that she declined to *sign* the consent to search form. Defense counsel, who elicited this testimony, presented no other evidence on the issue. Because the mother's actions relating to the consent to search were not at issue at the suppression hearing—the defendant had claimed only that his father had not given valid consent to search and, in fact, expressly had indicated that the mother's consent was *not* necessary—the state had *no reason whatsoever* to present any evidence regarding the mother's consent or lack thereof, and, consequently, it did not do so. As a result, we simply do not know any of the other circumstances surrounding the mother's refusal to sign the consent to search form. In other words, we do not know, because the record does not reveal, whether she (1) declined to sign the form but orally consented to the search, (2) acquiesced in her husband's consent to the search, (3) affirmatively refused to consent to the search, or (4) took some other position regarding the search. All we know is that she did not sign the consent to search form.

The plurality, however, equates the mother's refusal to *sign* the consent form with her refusal to *consent* to the search. This inferential leap is patently unreasonable because it is axiomatic that refusing to sign a consent to search form is *not* tantamount to refusing to consent to the search; rather, it is simply one of several relevant factors that a court considers in determining the validity of a consent to search. See, e.g., *United States* v. *Lattimore*, 87 F.3d 647, 650–51 (4th Cir. 1996). Because the refusal to sign a consent to search form is one of several factors to be considered in determining the validity of consent, such refusal does not vitiate consent otherwise found to be valid in light of all of the circumstances. See, e.g., *United States* v. *Price*, 54 F.3d 342, 346–47 (7th Cir. 1995); *United States* v. *Thompson*, 876 F.2d 1381, 1384 (8th Cir.), cert. denied, 493 U.S. 868, 110 S. Ct. 192, 107 L. Ed. 2d 147 (1989);

*United States* v. *Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989); *United States* v. *Boukater*, 409 F.2d 537, 538–39 (5th Cir. 1969); see also *State* v. *Fields*, 31 Conn. App. 312, 325, 624 A.2d 1165 ("a consent to search does not have to be in writing to be valid"), cert. denied, 226 Conn. 916, 628 A.2d 989 (1993). "Whether a [person] voluntarily has consented to a search is a question of fact to be determined by the trial court from the totality of the circumstances based on the evidence that it deems credible along with the reasonable inferences that can be drawn therefrom." (Internal quotation marks omitted.) *State* v. *Nowell*, 262 Conn. 686, 699, 817 A.2d 76 (2003). Thus, "no one factor is controlling" on the issue of voluntariness; (internal quotation marks omitted) *State* v. *Reddick*, 189 Conn. 461, 469, 456 A.2d 1191 (1983); including the fact that the person whose consent to search was sought refused to sign a consent form.[19] See, e.g., *United States* v. *Price*, supra, 347 (upholding validity of consent search notwithstanding defendant's refusal to sign consent to search form); *United States* v. *Thompson*, supra, 1384 (same); *United States* v. *Castillo*, supra, 1082 (same). Consequently, the refusal of the defendant's mother to sign the consent to search form is but one factor that the court would have been required to consider if the court had been asked to determine whether she had consented to the search, acquiesced in the search or objected to the search. Rather than acknowledge the fact that the defendant's mother's refusal to sign the consent form is not dispositive of the issue of consent—an acknowl-

---

[19] It is equally well established that an accused may be found to have knowingly and voluntarily waived his *Miranda* rights even though he has elected not to sign a waiver form. See, e.g., *North Carolina* v. *Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Harris*, 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983). Similarly, an oral statement or confession will not be deemed to be involuntary merely because an accused has declined to reduce it to writing. E.g., *State* v. *Barrett*, 205 Conn. 437, 450–51, 534 A.2d 219 (1987).

edgment that would be fatal to its conclusion—the plurality simply chooses to ignore it.[20] Indeed, the plurality does not even mention the fact that consent always is an issue that is decided on the basis of the totality of the circumstances.

The issue of the defendant's mother's consent, moreover, was not before the court, because, as I previously explained, only the consent of the defendant's father was the subject of the defendant's motion to suppress the bloody clothing. The facts relevant to the issue of the defendant's mother's consent, therefore, never were adduced in the trial court. Furthermore, as I also previously explained, because the defendant's motion did not implicate the mother's consent or lack thereof, the state was not on notice that it was required to establish, on the basis of the totality of the circumstances, that the defendant's mother had consented to or acquiesced in the search.[21]

[20] The concurring justice acknowledges that the validity of a consent to search is determined on the basis of the totality of the circumstances. The concurring justice also indicates that such consent may be established even though the person consenting has declined to sign a consent to search form. Inexplicably, however, the concurring justice then proceeds to equate the defendant's mother's refusal to sign the form with her refusal to consent to the search even though (1) there is absolutely nothing in the record regarding the other circumstances that the concurring justice concedes are necessary to the determination of whether the defendant's mother did consent to the search, and (2) the absence of that factual record is attributable to the defendant, and to the defendant alone, because the state never had any reason or opportunity to present those circumstances in view of the fact that the only claim that the defendant raised in the trial court implicated the consent of the defendant's father and not the consent of his mother.

[21] Although mere acquiescence to a claim of lawful authority is not sufficient to establish consent; see, e.g., State v. Jones, supra, 193 Conn. 79; to the extent that the constitutional principle adopted by the plurality bars the police from conducting a search only when one of the co-occupants present affirmatively objects to the search; see footnote 3 of this opinion; the state could have prevailed under the plurality's new constitutional principle merely by showing that the defendant's mother did not affirmatively object to the search. Thus, for example, under that constitutional principle, the state could have demonstrated that the search was lawful if it had established that the defendant's mother had acquiesced in her husband's consent.

On the basis of the trial court record, therefore, we simply do not know why the defendant's mother declined to sign the consent to search form. To be sure, it is *possible* that she did not sign it because she was unwilling to consent. It also may be, however, that she did not sign it because she thought that her husband's signature on the form was sufficient, or because, although she did not object to the search, she nevertheless was reluctant to sign such a document without further consultation with her husband or an attorney, or otherwise. In other words, on the current state of the record, we are required to speculate as to why the defendant's mother did not sign the consent to search form. Because, however, there are any number of reasons for her refusal to execute the form that are fully consistent with a willingness on her part to allow the police to search the house, and because the state had no obligation or incentive to adduce any evidence regarding the mother's consent or lack thereof, no conclusion—indeed, no inference—reasonably can be drawn from her failure to sign the form.[22] In such circumstances, it is clear that the defendant has failed to satisfy the first prong of *Golding* because the "facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred." *State* v. *Golding*, supra, 213 Conn. 240. The plurality's contrary conclusion turns the first prong of *Golding* on its head by relieving the defendant of *his*

---

[22] In fact, to the extremely limited extent that the record contains any other evidence that may be deemed to bear upon the question of the defendant's mother's consent, that evidence, specifically, the fact that the defendant's father and mother returned home together to let the police in, and the fact that the defendant's mother may have offered coffee to the police during their search of her home; see footnotes 9 and 10 of this opinion; suggests that she did not oppose the search. This evidence, which was adduced by the parties during the litigation of the defendant's claim challenging the validity of his father's consent, merely underscores the obvious and undisputed fact that a person's refusal to sign a consent to search form is one of several relevant factors to be considered in determining the broader issue of consent.

burden of providing a record that clearly and unambiguously demonstrates that his mother objected or otherwise withheld her consent to the search. Indeed, this court recently has reiterated the fundamental point that "[i]t is incumbent upon the [defendant] to take the necessary steps to sustain [his] burden of providing an adequate record for appellate review. . . . Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Internal quotation marks omitted.) *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 101, 861 A.2d 1160 (2004).

The plurality makes the startling assertion that "[t]he adequacy of the record cannot turn, without more, on the mere choice of words used by witnesses or the trial court." In other words, according to the plurality, insofar as the suppression hearing witnesses are concerned, we are not bound by their "mere choice of words" in evaluating the adequacy of the record. On the contrary, it is precisely the words of the witnesses that comprise the record to be evaluated. Moreover, other than the testimony of the suppression hearing witnesses, there is absolutely nothing in the record that bears upon the issue of the defendant's mother's consent to search. The plurality's unprecedented and utterly unsupportable contention that the record cannot "turn . . . on the mere choice of words used by witnesses" reflects the flaw in the plurality's analysis, namely, the plurality's refusal to acknowledge the fundamental distinction between refusing to sign a consent to search form and refusing to consent.

Finally, in support of its conclusion regarding the adequacy of the record, the plurality relies on the trial court's statement that, "[i]t is clear that . . . one of

the parents . . . declined to consent to [the] search." In particular, the plurality asserts that "[i]t is precisely this finding which perfects the record for review." Building on its conclusion that the court's statement constituted a "finding," the plurality further asserts that this court must accept the finding because the trial court (1) "observed firsthand the demeanor of the defendant's parents when they testified" that the mother had not signed the consent form, and (2) "was best situated to evaluate the overall tenor of their testimony."

For a myriad of reasons, the plurality utterly fails in its attempt to elevate the trial court's statement into a finding, let alone one entitled to deference on appeal. First, it bears emphasizing that the trial court issued its brief ruling denying the defendant's motion to suppress the bloody clothing from the bench, immediately prior to the commencement of trial, and, further, that the only claim raised in that motion was the purported invalidity of the defendant's father's consent to search. Consequently, in fairness to the trial court, it is highly likely that the court's passing and fleeting observation that the defendant's mother had "declined to consent to [the] search" was intended as nothing more than a shorthand reference to the undisputed fact that the state had not established her consent. To conclude otherwise would be to presume that the trial court had reason to be careful about how it characterized the role of the defendant's mother in the search; the court had no such reason because no issue relating to her involvement in the search was ever before the court.

Second, as the state notes, the court's statement goes well beyond the record: the *only* evidence regarding the mother's consent or lack thereof was her testimony and the testimony of her husband that she declined to sign the consent to search form. There was absolutely no other evidence in the record from which the trial court could have made a determination, one way or the

other, regarding the mother's consent. In the absence of any such evidence, the trial court's statement is entirely without a foundation in the facts.[23]

In light of the trial court's statement in that broader context, it is preposterous to attribute significance to that statement for the reason given by the plurality, namely, because the trial court "observed firsthand the demeanor of the defendant's parents when they testified and was best situated to evaluate the overall tenor of their testimony." As I have explained, that testimony consisted of one sentence by the defendant's father that his wife had declined to sign the consent form and one sentence by the defendant's mother confirming that she had declined to sign the consent form. With respect to the mother's failure to sign the consent form, what more could be gleaned—even by the most observant and acute fact finder—from the "demeanor" of those witnesses or the "overall tenor" of their testimony? Contrary to the bald assertion of the plurality: absolutely nothing.

---

[23] The concurring justice incorrectly postulates that the defendant's mother's lack of consent reasonably may be inferred from her refusal to sign the consent to search form. This conclusion, which fairly can be characterized as the product of a judicial sleight of hand, would be correct if the state had borne the burden of establishing that the defendant's mother had consented. Indeed, in that case, the trial court would have been required to find that the mother had declined to consent because there is no other evidence in the record with respect to that issue. No such conclusion or inference may be drawn in the circumstances of the present case, however, because the issue of the mother's consent never was before the court and, therefore, the state never had any reason to establish that the mother had consented or otherwise had not objected to the search, let alone any burden to do so. Indeed, the state satisfied the only burden that the defendant's claim required it to shoulder, namely, to prove that the defendant's father's consent to search was valid. Consequently, as I have explained, we simply do not know what the mother did or said, aside from refusing to sign the form, in regard to granting or withholding her consent to the search. Like the plurality, the concurring justice simply ignores this fact, thereby placing the burden of the inadequate record on the state rather than on the defendant. In doing so, the concurring justice joins the plurality in rendering a decision that is patently in violation of the first prong of *Golding*.

Furthermore, even if the trial court's statement were supported by the record, the statement nevertheless could not reasonably be characterized as a "finding" of any consequence to our determination of the adequacy of the record. Because the issue of the mother's consent was not before the trial court, the court had no reason to make any finding relative to that issue; similarly, the state had no reason either to adduce any evidence demonstrating the mother's consent or to challenge the court's statement that she had declined to consent. Indeed, the state had no real opportunity to seek to correct the trial court's misstatement, as it was made during a brief oral ruling, and less reason to do so, because the court denied the defendant's motion to suppress in its ruling and trial proceeded immediately thereafter. Although the court stated that it would issue a written ruling on the defendant's motion to suppress "at the conclusion of the case," the court never did so. In such circumstances, even if the record supported the court's statement—which it does not—the statement would have been, at most, akin to dictum; see *DaCruz* v. *State Farm Fire & Casualty Co.*, 268 Conn. 675, 686, 846 A.2d 849 (2004) ("[f]indings on nonessential issues usually have the characteristics of dicta" [internal quotation marks omitted]); and, as such, it would not be entitled to weight by this court. Indeed, because there was no meaningful factual inquiry into the mother's conduct relative to the consent to search, the trial court's statement regarding that conduct is of no force or effect.[24]

---

[24] The concurring justice seeks to remove the trial court's statement from the realm of dicta by arguing that it was material to the court's finding regarding the validity of the defendant's father's consent to search. Specifically, the concurring justice refers to the juxtaposition of the trial court's statement that the defendant's mother had "declined to consent to [the] search" with the court's reference to *State* v. *Jones*, supra, 193 Conn. 70. The concurring justice's labored effort to inject some significance into the trial court's statement is entirely unavailing. The trial court adverted to *Jones* in reference to the defendant's contention that his father's consent was invalid because it was based on a claim of lawful authority by the police, the very argument that we had addressed in *Jones*. Indeed, there is

The plurality's willingness to decide the defendant's unpreserved constitutional claim on the strength of the trial court record is especially unfair because, as I have

absolutely nothing about the conduct of the defendant's mother that is relevant, let alone essential, to the trial court's finding regarding the validity of the father's consent. Moreover, even if the court's statement about the mother's refusal to consent was somehow material to the court's finding concerning the father's consent, that statement would not be entitled to any weight because, as I discussed previously, the state never had any reason to address the issue of the mother's consent in light of the fact that the defendant never raised it below.

In a further effort to justify the conclusion that the trial court's statement is entitled to weight, the concurring justice contends that, "it is evident by comparing the trial court's discussion of [the defendant's mother's] consent or lack thereof with its discussion of [the defendant's father's] consent that, in the trial court's view, the decision to sign or not to sign the consent form was synonymous with a decision whether to consent to the search, absent evidence to the contrary. The trial court found that [the father] voluntarily had consented to the search of his home based solely on his decision to sign the consent form following a discussion with his brother. The trial court did not discuss consent based on conduct or verbal acquiescence. Rather, the court discussed consent only in the context of the signed form." The concurring justice then asserts that, because the defendant's mother did not sign the form, the trial court must have viewed that conduct as reflecting her "refusal to consent to the search." This argument also is baseless. First, it is a mischaracterization to describe the trial court's comment regarding the mother's conduct as a "discussion" of that conduct, and the concurring justice cannot transform that passing reference into something comparable to the trial court's findings and ruling on the issue of the father's consent simply by asserting it to be so. Moreover, as I have explained, because the defendant never raised the issue of the mother's consent in the trial court and the record never was developed regarding that issue, it is patently unreasonable to presume that the trial court nevertheless would have endeavored to make a "finding" with respect to that issue. The concurring justice completely overlooks that fact in contending that the trial court found that the mother's refusal to sign the consent form was tantamount to a refusal to consent "absent evidence to the contrary." There was no such "evidence to the contrary" because, as the trial court well knew, the issue of the mother's consent was not before the court. Furthermore, in rejecting the defendant's motion to suppress, the trial court properly focused on the fact that the defendant's father had signed the consent form and that he had done so freely and with a full understanding of his rights. See footnote 25 of this opinion. Because the defendant's father had signed the form, and because the defendant presented no evidence to suggest that his signature did not reflect his informed consent, the court had no reason otherwise to comment extensively on the father's "conduct or verbal acquiescence."

explained, the state never had any reason to address the issue of the mother's consent. We previously have declined to countenance such an ambush of the state. For example, in *State* v. *Medina*, 228 Conn. 281, 300–302, 636 A.2d 351 (1994), this court declined to review an unpreserved constitutional claim regarding the alleged involuntariness of the confession of the defendant, Angel Medina, because the record was inadequate for review. In the trial court, Medina filed a motion to suppress his confession on the ground that it had not been made knowingly and voluntarily because he had not been given his *Miranda* warnings. See id., 296. For the first time on appeal, Medina raised a different claim under the state constitution, namely, that his confession was involuntary due to his impaired mental state. See id., 293, 295. In explaining why the record was insufficient for appellate review of Medina's unpreserved state constitutional claim, we observed that, "because [Medina] did not clearly raise [that] . . . claim in the trial court, *the state was not put on notice that it was required to defend against such a claim. Thus, neither the state nor the trial court—nor this court on appeal—had the benefit of a complete factual inquiry into [Medina's] mental condition at the time his statements were made.*" (Emphasis added.) Id., 300. We further noted that "[t]he trial court never ruled on the issue of the voluntariness of [Medina's] statements under the state constitution because . . . that issue was not properly raised. *We do not know, therefore, whether the trial court, after conducting a full evidentiary hearing*

Finally, the concurring justice's assertion that the trial court necessarily equated the defendant's mother's refusal to sign the form with her refusal to consent ignores the fact that the determination of whether consent is knowing and voluntary depends on the totality of the circumstances, not just whether a consent form has been signed. In fact, to assert that the trial court believed that the mother's refusal to sign the consent to search form was tantamount to a refusal to consent unfairly imputes to the trial court the same fundamental misunderstanding of the law of consent that pervades the plurality and concurring opinions.

*and applying the state constitutional standard now
urged by [Medina], would have found [Medina's] state-
ments to have been involuntary.*" (Emphasis added.)
Id. *Precisely* the same can be said of the record in the
present case. Because the state had no reason to adduce
any evidence regarding the mother's role in the consent
to search, there was no meaningful factual inquiry into
that issue and, consequently, we have no idea what
such an inquiry would have revealed, and no idea what
the trial court would have found, about the mother's
consent or lack thereof. Cf. *State* v. *Daniels*, 248 Conn.
64, 80–81, 726 A.2d 520 (1999) (record inadequate to
review unpreserved constitutional claim that out-of-
court identification violated defendant's due process
rights because not all facts relevant to claim were
adduced in trial court).

Indeed, in his motion for review of the trial court's
denial of his motion for articulation, the defendant
expressly acknowledged that, as this court has
observed, "[f]acts are not admitted or undisputed
merely because they are not contradicted." (Internal
quotation marks omitted.) *State* v. *Watson*, 165 Conn.
577, 589–90 n.1, 345 A.2d 532 (1973), cert. denied, 416
U.S. 960, 94 S. Ct. 1947, 40 L. Ed. 2d 311 (1974); see
also *State* v. *Madera*, 210 Conn. 22, 38, 554 A.2d 263
(1989) (trial court "not bound to accept testimony at
face value merely because it might have been unrebut-
ted"). This admonition is particularly compelling in the
present circumstances because the state had absolutely
no opportunity or reason to rebut, to contradict or even
to explain any evidence that either was or might have
been adduced concerning the role of the defendant's
mother in regard to the consent to search.[25]

---

[25] The plurality asserts that, "[b]ecause the state could not have foreseen
whether it would prevail in establishing the voluntariness of the defendant's
father's consent, it is clear that [the state] had sufficient opportunity and
incentive to address the issue of the defendant's mother's consent at the
suppression hearing." Footnote 6 of the plurality opinion. The plurality's
attempt to rationalize its conclusion in this manner is inexplicable in view

## E

The plurality makes several additional points in response to my assertion that its *Golding* analysis is

of the suppression hearing testimony, which established beyond doubt that the defendant's father voluntarily and knowingly had consented to the search. Indeed, the defendant's father *himself* testified that: (1) he had reviewed the consent to search form, and the police had explained the form to him; (2) he understood the form; (3) he had been advised by the police that he had the right to refuse to sign the form; (4) no one had forced him to do so; and (5) he voluntarily had signed the form. In light of the foregoing testimony, it is manifestly unreasonable and unfair to hold the state responsible for failing to adduce evidence that the defendant's mother also had consented to the search. Indeed, the evidence of the defendant's father's consent was so overwhelming that it would have seemed curious for the state to have sought to prove that the defendant's mother also had consented.

The plurality's argument fails for a second reason. It may well be that the defendant's mother neither affirmatively consented to the search nor affirmatively objected to it. For example, she simply may have acquiesced in the defendant's father's decision to consent. See footnote 21 of this opinion. In that case, it is likely that (1) the state could not have established a valid consent to search on the basis of the mother's conduct *and* (2) the mother's acquiescence in the father's consent would *foreclose* a claim by the mother that the search violated her rights even under the new constitutional doctrine espoused by the plurality. In such circumstances, the state would have had no reason to adduce testimony demonstrating the mother's acquiescence, yet such a showing would have defeated the constitutional claim that the defendant has raised for the first time on appeal. Due to the plurality's terribly flawed *Golding* analysis, however, the state is forever barred from making such a showing.

I note, finally, the concurring justice's suggestion that the state somehow bears responsibility "[t]o the extent that the record is not as complete as this court ideally would like . . . ." In support of her assertion, the concurring justice observes that "it was the state's burden to prove that the police [had] obtained consent to the search" and, further, that she is "mindful of the defendant's efforts to perfect the record on this issue—filing a motion for an articulation on, inter alia, this issue and filing a motion for review of the trial court's denial of that motion—and the state's opposition to those efforts." This contention is specious, at best, for a multitude of reasons. Before enumerating those reasons, however, I am constrained to comment on the concurring justice's euphemistic characterization of the record as "not as complete as this court ideally would like . . . ." Under the first prong of *Golding*, the record either is adequate for review or it is not, and the defendant bears the burden of demonstrating that it is adequate. See *State* v. *Golding*, supra, 213 Conn. 240. Consequently, in fairness to the state, I see no reason why an appellate court ever should conduct a *Golding*

## fundamentally unsound. The first such point is that I

review of an unpreserved constitutional claim unless the record *is* "as complete as [the] court ideally would like . . . ." More importantly, for purposes of *Golding,* the record is not adequate unless, inter alia, it contains the facts upon which the unpreserved constitutional claim is predicated. In the present case, the record clearly is inadequate because a critical factual predicate is missing: we do not know whether the defendant's mother objected to the search.

I turn now to the reasons why there is absolutely no merit to the argument of the concurring justice that the state bears responsibility for the present state of the record. First, as the trial court found, the state clearly met its burden of establishing the validity of the search by demonstrating, contrary to the defendant's claim, that his father's consent was voluntary. Having made that showing, there was nothing more for the state to prove in order to defeat the defendant's motion to suppress. Second, as I previously have explained, the defendant's motion for articulation contained no indication that the defendant intended to raise a claim on appeal that he had not raised in the trial court. See footnote 15 of this opinion. Third, even if the defendant had alerted the trial court that he was seeking an articulation because he intended to raise a new claim on appeal, the trial court would have been under no obligation to grant the defendant's motion because it is axiomatic that a trial court is not required to render an articulation on a factual or legal claim that was not raised in the trial court. See id. Consequently, it is patently unreasonable for the concurring justice to intimate that the state's objection to the defendant's motion for articulation constituted an unwarranted attempt to block the defendant's legitimate efforts to amplify the record. Fourth, it is undisputed that the trial court properly denied the defendant's motion for articulation because the trial court's findings and conclusion are fully sufficient for this court's review of the sole claim that the defendant raised in the trial court with respect to the validity of the search, namely, that his father's consent to search was not valid. Fifth, the first time that the defendant indicated why he had sought an articulation *regarding the question of his mother's consent was in his motion for review,* a motion that this court properly denied because, as I indicated previously, a trial court is under no obligation to file an articulation on an issue that was not raised in that court. Sixth, the concurring justice does not, because she legitimately cannot, question the propriety of this court's determination, implicit in our denial of the relief sought by the defendant in his motion for review, that the trial court properly had denied the defendant's motion for articulation. Seventh, even if the trial court had granted the defendant's motion for articulation with respect to the issue of defendant's mother's consent, that articulation would have been unavailing because, as I have explained, the evidence presented at the hearing on the defendant's motion to suppress simply was not adequate for any finding or determination regarding the mother's consent or lack thereof in light of the fact that that issue was not the subject of the suppression hearing. For all these reasons, it is

improperly have attached "talismanic significance to the absence of a particular word, i.e., the failure of the witnesses to [testify] that the [defendant's] mother 'objected,' despite the fact that the testimony clearly indicated the unwillingness of the defendant's mother to consent to the search." I respectfully submit that the plurality plainly has it backwards: the plurality places talismanic significance on the statement of the trial court that the defendant's mother "declined" to consent when it concludes that "[i]t is precisely this finding which perfects the record for review." For all the reasons that I have enumerated—not one of which the plurality addresses, let alone rebuts—no significance at all can be placed on that statement.

A second point made by the plurality relates to my conclusion that it is unfair to the state to reach the merits of the defendant's unpreserved constitutional claim. In particular, the plurality asserts that my "view fails to account for the unique nature of *Golding* review" in that, "[b]ecause a *Golding* claim by definition is a claim that has not been raised explicitly at trial, the unavailability of explicit notice to the state is inherent in the exercise of *Golding* review," and, therefore, "[t]he state . . . must be mindful at trial of the potential that the defendant will raise unpreserved constitutional claims on appeal." This assertion reveals the plurality's fundamental misunderstanding of *Golding*. It is true, of course, that *Golding* review invariably involves a claim that was not raised in the trial court and, therefore, neither the state nor the court then will have had notice of the claim. It is equally true that this case shares that similarity. What the plurality fails to recognize, however, is the bedrock principle underlying *Golding*, namely, that the record must be adequate *before* an appellate court will review an unpreserved constitu-

manifestly incorrect and unfair for the concurring justice to suggest that the state bears some responsibility for the inadequacy of the record.

tional claim. The record is not adequate when, as in the present case, the facts reasonably can be disputed by the state and the state never had an opportunity to prove those disputed facts in the trial court. It is *that* failure of notice that accounts for the obvious unfairness of the plurality's decision in the present case, not the defendant's failure to notify the state of its claim in the trial court.

Finally, the plurality expressly notes that "three members of this court" have found that the record is not "unclear or ambiguous . . . ." That is the only argument raised by the plurality that is supported by the record. More importantly, however, a judicial opinion must be judged not on the number of votes that it has garnered but on its reasoning. In my view, the fact that a majority of the members of this panel has agreed that the defendant has satisfied the first prong of *Golding* merely serves to underscore the point that the majority sometimes is wrong. I submit that that is clearly the case here. I trust that my conclusion in that regard will be evaluated not on the basis that it is, at least among the members of the present panel, a minority view but, rather, on its merit or lack thereof.

F

Although I do not reach the merits of the defendant's constitutional claim, I am compelled to address one aspect of the plurality's analysis of that issue, namely, its response to the state's contention that the defendant cannot piggyback on his mother's purported refusal to consent, but, rather, that he is bound by his father's valid consent to search. The plurality purports to answer that contention by asserting, contrary to the claim of the state, that the defendant has "standing to invoke his mother's privacy rights." Footnote 4 of the plurality opinion. The plurality then proceeds to justify this conclusion by explaining that the defendant has a reason-

able expectation of privacy in the family house because he lived there. The plurality's response to the state's contention misses the point completely.[26] It is axiomatic that the rights guaranteed by the fourth amendment are personal and may not be asserted vicariously; e.g., *Rakas* v. *Illinois*, 439 U.S. 128, 133, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978); *State* v. *Morrill*, 197 Conn. 507, 540, 498 A.2d 76 (1985); and no claim has been made that the state constitution provides otherwise. Thus, the plurality's assertion that the defendant has standing to invoke his mother's privacy rights cannot possibly provide the basis for a determination that the defendant is entitled to invoke his mother's purported refusal to consent.[27] Indeed, it is undisputed that the defendant had standing to challenge the legality of the search of the home in which he resided because of *his* reasonable expectation of privacy in those premises. But the defendant's standing to challenge the search of those premises does not answer the entirely different question of whether he may assert his mother's refusal to consent or whether, as the state contends, he is bound by his father's valid consent.

It is readily apparent why the plurality's treatment of this question misses the mark. The defendant's legitimate expectation of privacy in the home in which he resides is the reason why he has standing to challenge the validity of the search of that home. Whether, however, that search violated the *defendant's* constitutional rights—that is, whether the search was constitutionally invalid as against *him*—is an altogether separate question. It is true, under the rule that the plurality adopts,

[26] The same may be said of the concurring opinion insofar as the concurring justice adopts the reasoning of the plurality on this point.

[27] As I discussed previously in this dissent, the record does not establish that the defendant's mother declined to consent, merely that she declined to sign the consent to search form. For purposes of this discussion only, however, I assume that the record establishes that the defendant's mother declined to consent to the search itself.

that the search violated the defendant's *mother's* rights because she declined to consent to the search; consequently, if the state sought to use evidence obtained from the search against *her*, she would be entitled to have that evidence suppressed. Certainly, however, if the state had sought to use the fruits of the search against the defendant's *father*, he would *not* be entitled to invoke the defendant's mother's refusal to consent and thereby obtain the suppression of evidence obtained with his consent; in other words, the search did not violate the defendant's father's rights because he consented to it. The present case raises a different issue: does the defendant have the right to assert his mother's refusal to consent to the search and thereby preclude the state from using the fruits of that search *against him* even though his father validly consented to the search? In concluding that the defendant is entitled to invoke his mother's refusal to consent because he has a reasonable expectation of privacy in his home, the plurality begs, rather than answers, that question.

The plurality's failure to address this question meaningfully is a critical one. Only a few states have adopted the constitutional principle that this court adopts today,[28] and, notwithstanding any suggestion to the contrary by the concurring justice, no federal court has done so.[29] In those few state cases, however, the state

---

[28] See *Silva* v. *State*, 344 So. 2d 559, 563 (Fla. 1977); *State* v. *Randolph*, 278 Ga. 614, 604 S.E.2d 835 (2004), cert. granted, 544 U.S. 973, 125 S. Ct. 1840, 161 L. Ed. 2d 722 (2005); *In re Welfare of D.A.G.*, 484 N.W.2d 787, 790 (Minn. 1992); *State* v. *Leach*, 113 Wash. 2d 735, 744, 782 P.2d 1035 (1989).

[29] Indeed, in the seminal federal case in this area, *United States* v. *Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974), the United States Supreme Court concluded that the consent of the defendant's co-occupant was binding on the defendant even though the defendant was present at the scene of the search and never was asked by the police whether he would consent to it. Id., 166–67, 177. *Matlock* and the present case, therefore, are factually very close; in fact, I do not believe that there is any meaningful factual distinction—that is, a factual distinction of federal constitutional significance—between the two cases.

sought to use the fruits of an otherwise valid consent search against an accused who was present when the police sought to obtain consent to search but whose consent the police had not obtained. Thus, no case has addressed directly the issue raised by the present appeal, namely, whether a defendant can stand in the shoes of another person who has objected to a search of the defendant's premises or property even though a third co-occupant validly consents to the search. In that key respect, the holding of the plurality is a significant extension of the minority view, and one that the plurality has completely failed to justify. Because privacy rights are personal, and because the rationale underlying the minority rule is predicated on the primacy of that principle, there remains, at the very least, a serious question as to why the defendant should be entitled to invoke his mother's purported refusal to consent to the search in view of the fact that his father did validly consent; indeed, I am aware of no persuasive reason why the defendant should be permitted to invoke his mother's refusal to consent. In any event, the judgment of this court reversing the defendant's murder conviction hinges on a reasoned analysis and resolution of that question. Because the plurality has accomplished neither, the validity of its judgment is highly suspect.[30]

### G

In sum, the plurality's conclusion regarding the adequacy of the record is fatally flawed because it is predicated on a similarly flawed premise, namely, that the refusal to sign a consent to search form is the same as the refusal to consent to the search itself. Because the two cannot be equated, and because all we do know is that the defendant's mother refused to sign the form,

---

[30] I reiterate that the judgment of this court is fundamentally erroneous because *Golding* operates as a bar even to our consideration of the issue of whether the defendant is entitled to invoke his mother's purported refusal to consent to the search.

we do not know whether the defendant's rights were violated under the new constitutional principle that the court today adopts. The plurality and the concurring justice nevertheless conclude that such a violation exists and hold that evidence critical to the state's case must be suppressed.[31] Of course, the suppression of evidence is fully warranted—indeed, it is mandated—when such evidence is the product of a constitutional violation. But a serious public injustice is done when, as in the present case, the state is deprived of the use of vital evidence by a reviewing court that, after trawling for facts in an incomplete and inherently ambiguous record, necessarily resorts to guesswork and conjecture to find a constitutional violation. Because the record clearly is inadequate for review of the defendant's constitutional claim, that claim must be rejected under the first prong of *Golding*.

## II

The defendant claims that the trial court improperly denied his motion to suppress his confession and his motion to suppress the clothing seized from his home.

---

[31] As a consequence of the plurality's holding that the defendant's state constitutional rights were violated by the search of his house, the state will be precluded from using the fruits of that search, in its case-in-chief, at any future trial of the defendant. That evidence consists of the defendant's bloody tank top, which contains the victim's DNA, and his detailed confession, including his acknowledgment that the pendant that was found in the victim's hair belonged to him. Although it is conceivable, of course, that the state may be able to salvage some of the evidence that the plurality concludes was obtained illegally by the police; see, e.g., *State* v. *Clark*, 255 Conn. 268, 280–81 n.29, 764 A.2d 1251 (2001) ("[u]nder the inevitable discovery rule, evidence illegally secured in violation of the defendant's constitutional rights need not be suppressed if the state demonstrates by a preponderance of the evidence that the evidence would have been ultimately discovered by lawful means" and that those "lawful means which made discovery inevitable . . . were being actively pursued prior to the occurrence of the constitutional violation" [internal quotation marks omitted]); it is by no means clear from the record that the state will be able to demonstrate an exception to the suppression requirement.

With respect to the former, the defendant contends that his confession was the product both of his illegal arrest, which the defendant maintains was unlawful because the state lacked probable cause to detain him, and the illegal search of his home, which the defendant contends was unlawful because his father's consent to search was involuntary and, therefore, invalid. The defendant further claims that: (1) the state improperly adduced testimony concerning the defendant's request for a Bible in violation of his *Miranda* rights; (2) the trial court improperly denied the defendant's application for a one day continuance of the trial; and (3) the trial court improperly permitted the state to adduce evidence of the defendant's post-*Miranda* silence. These claims are without merit.

## A

The defendant first contends that the trial court improperly failed to suppress his confession and the clothing that the police had seized from his home.[32] I disagree.

The following additional facts, which were adduced at the hearing on the defendant's motions to suppress, are necessary to a resolution of these claims. On the morning of Saturday, June 24, 2000, the West Haven police received a report that a dead body had been discovered behind the Washington Avenue Magnet School. Joseph Biondi, a detective with the West Haven police department, and John Brunetti, also a detective with that department and the brother of the defendant's father, found the victim's body lying facedown in a wooded area behind the school. Later that day, the

---

[32] Although the defendant invokes both the federal and state constitutions in support of his claim, he does not contend, with respect to this claim, that the state constitution affords him any greater rights than the federal constitution. Accordingly, for purposes of this appeal, I treat the applicable federal and state constitutional provisions as affording the defendant the same level of protection.

police received information that the defendant had been in the vicinity of the crime scene at the time of the victim's murder.[33] Detective Brunetti withdrew from the investigation and was replaced by Anthony Buglione, a detective with the state police.

On the evening of June 24, Biondi and Buglione went to the residence at 208 Center Street in West Haven where the defendant lived with his parents. The defendant's parents were outside when the police arrived. The police informed them that they were investigating a homicide, that the defendant had been identified as a possible suspect in that homicide and that the detectives wanted to know of the defendant's whereabouts on the preceding evening. The defendant's father was cooperative and went inside to get the defendant, who emerged from the house with his father about fifteen minutes later. Biondi told the defendant why he and Buglione were there and asked whether the defendant would be willing to accompany them to the police station to answer some questions. According to Biondi, he told the defendant that he did not have to go with them, but the defendant agreed to do so, and the detectives then transported the defendant to the station. According to the defendant, however, he did not believe that he was free to refuse to go to the station with the detectives.[34] The defendant's parents followed the detectives and the defendant to the station, where they planned to wait until the detectives had completed their questioning of the defendant.

Upon arriving at the police station, Biondi and Buglione took the defendant to a small office in the detective

[33] The police received this information about the defendant from Michael Scott, whom the defendant knew as "Big Mike." In his confession, the defendant noted that, as he was leaving the scene of the crime, he saw Scott and several other men seated at a picnic table nearby and exchanged greetings with them.

[31] As I previously noted, the defendant testified at the suppression hearing and at trial. See footnotes 8 and 13 of this opinion.

bureau and closed the door. Buglione informed the defendant that they were investigating the murder of a woman whose body had been discovered behind a school. The detectives did not advise the defendant of his *Miranda* rights, but, according to Biondi, he specifically told the defendant that he was free to leave. Biondi further testified that the defendant indicated that he wished to stay and answer the detectives' questions. The defendant testified, however, that he repeatedly had told the detectives that he wanted to leave but that they had informed him that he could not do so.

Buglione asked the defendant where he had been the previous evening. The defendant provided an alibi for the evening, explaining that he had been at a party with a friend. Buglione reduced the defendant's statement to writing but doubted the veracity of the statement in light of the defendant's overall demeanor and his inability to remember certain details regarding the evening's events. The defendant eventually signed the statement.

While the defendant was still at the police station, Detective Mark Testoni of the Connecticut state police approached the defendant's parents, who were at the station waiting for the defendant, and presented them with a consent to search form for their home. Testoni explained the form, told them that they had a right not to sign it and asked them if they nevertheless would be willing to do so. Detective Brunetti, the defendant's father's brother, was sitting with the defendant's parents when Testoni approached them and requested their consent to search their home. The defendant's father asked Detective Brunetti what could happen if he declined to sign the form, and Detective Brunetti stated that "they could obtain a search warrant and possibly keep you from going back into your home until the search warrant . . . is obtained." In addition, Detective Brunetti told the defendant's father that he would be "better off complying. You know, do the right thing,

basically." The defendant's father then read the consent to search form and signed it. According to the defendant's father, he was not forced to sign the form but, rather, did so voluntarily. Upon obtaining the executed consent to search form, Testoni and Detective James Sweetman of the West Haven police department went to the defendant's home and searched it. While searching the laundry area of the basement, they found and seized certain evidence, including what appeared to be bloody clothing belonging to the defendant.

Upon learning that Testoni and Sweetman had found bloody clothing in the laundry area of the defendant's home, Buglione informed the defendant of the discovery and told the defendant that he, Buglione, had a "problem" with the veracity of the statement that the defendant had provided. The defendant started to cry and asked for a Bible. Buglione left the room to find a Bible but, unable to locate one, soon returned to the interview room. Upon his return, Buglione read the defendant his *Miranda* rights from a state police waiver form. The defendant initialed each warning and signed the waiver form indicating that he had been advised of his constitutional rights and that he wished to waive them and to speak to the police. The defendant then admitted that he had killed the victim, explaining in detail why and how he had done so. See footnote 4 of this opinion. Buglione transcribed the defendant's statement, which the defendant signed. The defendant then formally was placed under arrest and charged with the victim's murder.

On the basis of the foregoing evidence, the trial court concluded that the detectives took the defendant into custody when they transported him to the police station and that he remained in their custody at all relevant

times thereafter.[35] The trial court also concluded, however, that the defendant had been given *Miranda* warnings before he gave the police his second, inculpatory statement. The court further found that the defendant understood his rights and knowingly and intentionally waived them when he provided the police with that second statement. With respect to the defendant's father's consent to search, the court found that that consent was knowing and voluntary and, therefore, valid. See footnote 12 of this opinion. The court expressly rejected the defendant's claim that the consent was invalid because of what Detective Brunetti had told the defendant's father in response to the father's inquiry of Detective Brunetti about what could happen if he elected not to sign the consent to search form.

I turn now to the merits of the defendant's claims that the trial court improperly denied his motions to suppress his confession and the clothing seized from his home. In view of the fact that both of those claims hinge, more or less, on the defendant's contention that the search of his home was unlawful due to the alleged invalidity of his father's consent to search, I address that issue first.

"Under both the fourth amendment to the federal constitution and article first, § 7, of the state constitution, a warrantless search of a home is presumptively unreasonable. E.g., *Payton* v. *New York*, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980); *State* v. *Gant*, 231 Conn. 43, 63 and n.15, 646 A.2d 835 (1994),

---

[35] In light of the trial court's conclusion that the defendant was in custody when he gave his first statement, and because the state conceded that the defendant had not been advised of his *Miranda* rights prior to that statement, the trial court granted the defendant's motion to suppress that initial statement. Although the state does not concede that the trial court properly found that the defendant was in custody at that time, the state nevertheless has not challenged that finding on appeal. Consequently, the propriety of the court's ruling with respect to the defendant's motion to suppress his first statement is not the subject of this appeal.

cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). A search is not unreasonable, however, if a person with authority to do so has voluntarily consented to the search. E.g., *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 242–43, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State* v. *Cobb*, 251 Conn. 285, 314, 743 A.2d 1 (1999) . . . cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000); *State* v. *Reagan*, 209 Conn. 1, 7, 546 A.2d 839 (1988). The state bears the burden of proving that the consent was free and voluntary and that the person who purported to consent had the authority to do so. . . . *State* v. *Reagan*, supra, 7. The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. *State* v. *Jones*, [supra, 193 Conn. 79]. The question [of] whether consent to a search has . . . been freely and voluntarily given, or was the product of coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances . . . *State* v. *Reagan*, supra, 7–8; and, ultimately, requires a determination regarding the putative consenter's state of mind. *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 609, 711 A.2d 688 (1998)." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 43–44, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

For purposes of this claim only, the defendant does not dispute that his father had authority to consent to the search of his home. The defendant also acknowledges that the record establishes that the police explained the consent to search form to the defendant's father, that he was advised that he had the right not to sign it, that he understood that right, and that no one forced him to sign it. The defendant claims, rather, that his father's consent was not voluntary "in the constitutional sense" because his father was "led to believe

that withholding consent would be a futile act." The defendant's claim is predicated on the fact that his father's brother, Detective Brunetti, in response to an inquiry by the defendant's father about the consent to search, stated that the police "could obtain a search warrant and possibly keep [him] from going back into [his] home until the search warrant . . . is obtained."

It is true that, if the police had instructed the defendant's father that they *would* obtain a search warrant if the defendant refused to give consent, then such consent would have been involuntary, for constitutional purposes, because "the intimation that a warrant will automatically issue is as inherently coercive as the announcement of an invalid warrant." *Dotson* v. *Warden*, 175 Conn. 614, 621, 402 A.2d 790 (1978). In the present case, however, Detective Brunetti informed the defendant's father not that the police *would* obtain a warrant but, rather, that they "could," or *might*, obtain a warrant. This information was neither misleading nor inherently coercive,[36] and, consequently, the defendant cannot prevail on his claim that his father's consent was the product of improper police coercion. Accordingly, the defendant also cannot prevail on his claim that the trial court improperly denied his motion to suppress the bloody clothes that the police had discovered during their search of the defendant's home.

The defendant next contends that the trial court improperly denied his motion to suppress his confession. The defendant's claim is predicated on the assertion that his confession was the product both of his

---

[36] The same is true with respect to Detective Brunetti's further comment that the police "possibly" could bar the defendant's parents from entering their home if the decision was made to seek a search warrant. That comment was an accurate representation of standard police practice and it carried no suggestion that the defendant's father's refusal to consent to a search of the home automatically would result in a bar to the defendant's parents' reentry.

illegal arrest and the illegal search of his home. With respect to the former, the defendant contends that he was taken into police custody, without probable cause, when he was transported to the police station by Biondi and Buglione. With respect to the latter, the defendant contends that the police used the poisonous fruit of the illegal search, namely, the bloody clothing that the police discovered, to induce him to confess. With respect to the latter, I already have explained that the search was lawful, and, therefore, the seizure of the bloody clothing also was lawful. Thus, the officers' confrontation of the defendant with the fact that they had discovered the bloody clothing was not itself improper. I turn, therefore, to the defendant's claim insofar as it relates to his allegedly illegal arrest.

The trial court concluded, and for purposes of this appeal the state does not dispute, that the defendant was in police custody when he arrived at the police station. Because the police lacked probable cause to arrest the defendant at that time, the state acknowledges that "the trial court implicitly found that the defendant's initial confinement was illegal." For purposes of this appeal, the state also does not challenge that conclusion. Rather, the state contends that the nexus between the defendant's unlawful arrest and the confession that the police obtained from him while he was in their custody was sufficiently attenuated to warrant the state's use of the confession. I agree with the state.[37]

"As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the fourth amendment to the United States constitution. See *Wong Sun* v. *United*

---

[37] The trial court did not explicitly address the state's claim of attenuation. Both parties expressly agree, however, that the record nevertheless is fully adequate for our resolution of that issue on appeal.

*States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). [T]he rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures. *United States* v. *Calandra*, 414 U.S. 338, 347, 94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). To carry out this purpose adequately, the rule does not distinguish between physical and verbal evidence; see *Wong Sun* v. *United States*, supra, 485–86; nor does it apply only to evidence obtained as a direct result of the unlawful activity. See *Nardone* v. *United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939). Rather, the rule extends to evidence that is merely derivative of the unlawful conduct, or what is known as the fruit of the poisonous tree. See id. The application of the rule, however, is restricted to those situations [in which] its objectives are most efficaciously served. *United States* v. *Calandra*, supra, 348. Limiting the rule's application recognizes that in some circumstances strict adherence to the . . . rule imposes greater cost on the legitimate demands of law enforcement than can be justified by the rule's deterrent purposes. *Brown* v. *Illinois*, 422 U.S. 590, 608–609, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (Powell, J., concurring). Thus, evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint . . . . *Segura* v. *United States*, 468 U.S. 796, 805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." (Internal quotation marks omitted.) *State* v. *Luurtsema*, 262 Conn. 179, 189, 811 A.2d 223 (2002). In other words, "the question to be resolved concerning the admissibility of derivative evidence is whether, granting establishment of the primary illegality, the evidence to which the objection is made has been come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." (Internal quotation marks

omitted.) *State* v. *Blackman,* 246 Conn. 547, 556, 716 A.2d 101 (1998). The factors to be considered in determining whether the statement of an accused is sufficiently attenuated from the original illegality to cleanse it of its taint are: (1) whether *Miranda* warnings had been issued; (2) the temporal proximity of the illegal police action and the statement; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *State* v. *Luurtsema,* supra, 191–92; see also *State* v. *Colvin,* 241 Conn. 650, 654, 697 A.2d 1122 (1997).

In the present case, the defendant's confession was sufficiently attenuated from his unlawful arrest to purge any taint that flowed from that arrest. With respect to the threshold consideration of voluntariness, although Buglione confronted the defendant with the discovery of the bloody clothing about one-half hour after the defendant had made his first statement,[38] the defendant was given *Miranda* warnings before he agreed to provide the police with a second statement. It is true, of course, that the state cannot rely on *Miranda* warnings alone to establish that the initial illegality was sufficiently attenuated, but such warnings "are an important factor . . . in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown* v. *Illinois,* supra, 422 U.S. 603. Moreover, the defendant expressly waived his *Miranda* rights in writing prior to giving his second statement, and the trial court found that the defendant gave that statement knowingly and voluntarily.

In addition, the discovery of the bloody clothing at the defendant's home was a significant intervening cir-

---

[38] I agree with the defendant's assertion that "there was a close temporal sequence: (1) between the illegal seizure and the first statement, obtained less than two hours later . . . and (2) between the first and second statement, which commenced about thirty minutes after the first one was finished."

cumstance. The discovery of that clothing by the police, together with the information that the police already had placing the defendant at or near the scene of the murder at or around the time that it was committed, likely constituted probable cause to implicate the defendant in the victim's death. Although "[t]he intervening discovery of probable cause to support a suspect's detention, by itself, 'cannot assure in every case that the Fourth Amendment violation has not been unduly exploited'"; *United States* v. *Cherry*, 759 F.2d 1196, 1212 (5th Cir. 1985), quoting *Brown* v. *Illinois*, supra, 422 U.S. 603; "the intervening acquisition of probable cause is an important attenuating factor in the analysis." *United States* v. *Cherry*, supra, 1212; see also *Oliver* v. *United States*, 656 A.2d 1159, 1172 n.22 (D.C. App. 1995) ("[m]any courts have found that the acquisition of probable cause through independent means is a powerful factor to purge the taint of an earlier arrest").

Irrespective of whether the discovery of the bloody clothing gave rise to probable cause, the discovery itself constituted a significant intervening factor that tended to purge the taint of the underlying illegality. See, e.g., *People* v. *White*, 117 Ill. 2d 194, 224–25, 512 N.E.2d 677 (1987) (confrontation with untainted evidence may be legitimate intervening circumstance that induces voluntary desire to confess), cert. denied, 485 U.S. 1006, 108 S. Ct. 1469, 99 L. Ed. 2d 698 (1988). Although the defendant had given a statement to the police prior to being confronted with the discovery of the clothing, that statement was exculpatory in nature. When informed of the bloody clothing, however, the defendant confessed to the murder and described it in detail. In such circumstances, it is apparent that the incriminating statement was induced primarily by the lawful discovery of the damaging, untainted evidence and not by the initial, unlawful detention. See, e.g., *State* v. *Stevens*, 574 So. 2d 197, 204 (Fla. App. 1991); *Thorson* v. *State*, 653 So.

2d 876, 886 (Miss. 1994); *State* v. *Tobias*, 196 Wis. 2d 537, 550–51, 538 N.W.2d 843 (App. 1995).

The final consideration, namely, the purpose and flagrancy of the official misconduct, also militates decisively in favor of a finding of attenuation. Although the conduct of the detectives was purposeful in the sense that they brought the defendant to the police station to question him, their conduct was neither flagrantly in violation of the defendant's rights nor otherwise unduly intimidating or coercive. First, the record indicates that the detectives themselves did not believe that the defendant was under arrest when he accompanied them to the police station. Although the trial court concluded that the defendant reasonably did not believe that he was free to leave the station once he arrived there, the record also would have supported a contrary conclusion regarding the objective reasonableness of the defendant's belief that he was in custody from the time that he accompanied the police to the station. Furthermore, the defendant's father encouraged the defendant to speak with the police, and the defendant's mother and father followed the defendant to the station and remained there while the police interviewed him. In addition, the suppression hearing testimony is devoid of any indication that the detectives threatened or otherwise attempted to intimidate the defendant, by show of force, or in any other way.[39]

Upon consideration of all of the relevant factors, I would conclude that the defendant's confession was sufficiently attenuated from the initial illegality such that the confession reasonably cannot be characterized

---

[39] At the suppression hearing, the defendant did not indicate that the police had threatened him while he was at the police station. At trial, however, the defendant testified that the police had told him that he was "f-ed," and that, unless he cooperated, he would spend the rest of his life in prison. According to the defendant, the police also told him that, if he cooperated, he would be charged with manslaughter and "probably [would] do ten years."

as the product of that illegality.[40] The defendant's claim that his confession must be suppressed as the fruit of his illegal detention therefore is without merit.

## B

The defendant next contends that it was improper for the state to have adduced Detective Buglione's testimony that the defendant asked for a Bible after being told of the discovery of the bloody clothing at his home.[41] Specifically, the defendant claims that the state used that testimony in violation of his *Miranda* rights because: (1) he was in custody when he asked for the Bible; (2) the remark was made in response to questioning by the police; and (3) he had not been given *Miranda* warnings prior to making the remark. It is not necessary to reach the merits of the defendant's claim because, even if the admission of the challenged testi-

[40] The defendant relies on *Brown* v. *Illinois*, supra, 422 U.S. 590, and *Dunaway* v. *New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979), in support of his contention that his confession was the product of his first statement, which, for purposes of this appeal, the state concedes was the inadmissible fruit of the defendant's unlawful arrest. This claim lacks merit. *Brown* and *Dunaway* each involved factual scenarios in which the petitioner, after being arrested illegally, gave two statements to the police, *both of which* were incriminating. *Dunaway* v. *New York*, supra, 203–204; *Brown* v. *Illinois*, supra, 591, 594–95. In each case, the prosecution claimed that the second statement was admissible, and, in each case, the United States Supreme Court disagreed, concluding that the second statement was "the result and the fruit of the first." *Brown* v. *Illinois*, supra, 605; accord *Dunaway* v. *New York*, supra, 218 n.20. In the circumstances presented by *Brown* and *Dunaway*, the state has a heavy burden of establishing that the second statement is not the product of the first because a defendant who gives one incriminating statement is likely to believe that he has little to lose by giving a second such statement. In contrast to the statements in *Brown* and *Dunaway*, however, the defendant's first statement in the present case was *exculpatory*, and, consequently, any relationship between that statement and the confession that followed necessarily was significantly less direct than that of the statements at issue in *Brown* and *Dunaway*.

[41] The record indicates that the defendant did not preserve this claim in the trial court. Nevertheless, the record is adequate for our review of the claim.

mony was improper, the evidence was harmless beyond a reasonable doubt.

"Two conditions . . . give rise to the requirement of advice of rights under *Miranda*: (1) the suspect must be in the custody of law enforcement officials; and (2) the suspect must be subjected to interrogation." *State* v. *Medina*, supra, 228 Conn. 289. As I explained previously, the state does not challenge on appeal the trial court's finding that the defendant was in custody when he asked for a Bible. With respect to the second requirement, " '[t]he term "interrogation" under *Miranda* is not limited to questioning explicitly designed to elicit an incriminating response but extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. The police, however, cannot be held accountable for the unforeseeable results of their words or actions.' " Id., 290. Even if we assume, arguendo, that Buglione's statement informing the defendant of the discovery of the bloody clothing at his home constituted interrogation within the meaning of the second *Miranda* requirement, the state's use of the defendant's remark was harmless beyond a reasonable doubt. "The improper admission of a confession is harmless error [when] it can be said beyond a reasonable doubt that the confession did not contribute to the conviction." *State* v. *Hafford*, 252 Conn. 274, 297, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000). In the present case, the evidence against the defendant was overwhelming: the defendant was seen in close proximity to the crime scene at the time of the victim's murder, the victim's blood was found on the defendant's clothing, the defendant provided a detailed confession explaining how and why he had murdered the victim, a part of the defendant's necklace was found in the victim's hair and the defendant sought to cover up the crime by lying to his father

about the source of the blood on his clothing. Under the circumstances, any impropriety in the state's use of the challenged evidence was harmless beyond a reasonable doubt.

## C

The defendant also claims that the trial court improperly denied his request, which he made near the close of the evidentiary portion of the trial, for a one day continuance of the trial. This claim also lacks merit.

The following additional facts are relevant to this claim. At trial, the defendant testified that he did not murder the victim. He explained, rather, that, at approximately 1 a.m. on June 24, 2000, he went to the area of the Washington Avenue Magnet School to meet Jerrell Credle. When the defendant arrived, Credle was there, along with Michael Banores, Jose Rivera and Michael Scott. According to the defendant, Credle and the three other men took him to a wooded area behind the school and showed him the victim's body. At that time, the defendant removed his sweatpants and handed them to Credle, who dipped the pants in the victim's blood. The men then returned to the immediate area of the school and smoked marijuana.

On March 7, 2002, prior to the conclusion of the defendant's trial testimony, defense counsel made an offer of proof outside the presence of the jury. In connection with that offer of proof, the defendant testified that, at the time Credle and the others brought the defendant to the victim's body, Credle bragged about killing the victim and explained how he had done so. The defendant also testified that Credle had "recited some kind of blessing or prayer in the name of the god 'Mambay,' saying that the blood of the sacrifice is acceptable . . . ." The trial court sustained the state's objection to the proffered testimony on hearsay grounds, concluding that Credle's statements did not

fall within the hearsay exception for statements against penal interest. In explaining its ruling, the court stated, inter alia, that the statements lacked trustworthiness because, although both Scott and Rivera had testified at trial and were present when Credle allegedly had bragged about killing the victim, defense counsel elected not to examine them about Credle's purported incriminating statements. Defense counsel informed the court that he was attempting to locate Credle to subpoena him and that his inability to introduce Credle's hearsay statements would infringe unduly on the defendant's right to present a defense. At defense counsel's request, the court recessed at 3:30 p.m. that day to give defense counsel time to provide the court with precedent supporting his contention regarding the admissibility of the proffered testimony.

Trial resumed the following day, March 8, 2002, a Friday. Defense counsel did not provide the court with any law concerning the admissibility of the proffered hearsay testimony. Instead, the defendant requested a continuance until Monday, March 11, 2002, so that defense counsel could continue his efforts to locate Credle.[42] Defense counsel further explained that the defendant would complete his testimony that day, that there was a "good possibility" that he would have Credle available to testify on Monday, and that Credle would be the last defense witness. Defense counsel also noted that the trial actually had proceeded more quickly than he had expected. The trial court denied both the defendant's request for a continuance and the request to present the proffered evidence. The court again

---

[42] According to defense counsel, he had sought to subpoena Credle earlier in the week by attempting to subpoena him at an address in West Haven. Those efforts were unsuccessful because Credle apparently had moved. Defense counsel noted that he had obtained a New Haven address for Credle, which the state indicated was consistent with the information that it had regarding Credle's whereabouts. Moreover, both the state and the defendant indicated that Credle recently had been arrested.

explained that it was denying the request for a continuance on the basis of defense counsel's failure to elicit testimony from either Scott or Rivera regarding Credle's alleged admissions. The court also noted the length of time that the charges had been pending against the defendant and the belated nature of the defendant's request.

"It is well settled that [t]he determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . . A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . Our role as an appellate court is not to substitute our judgment for that of a trial court that has chosen one of many reasonable alternatives. . . . Therefore, on appeal, we . . . must determine whether the trial court's decision denying the request for a continuance was arbitrary or unreasonabl[e]." (Citations omitted; internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 711, 805 A.2d 705 (2002).

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to [constitute a constitutional violation]. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . We have identified several factors that a trial court may consider when exercising its discretion in granting or denying a motion for continuance. . . . These factors include the likely length of the delay . . . the impact of delay on the litigants, witnesses, opposing counsel and the court . . . the perceived legitimacy of the reasons proffered in support of the request . . . [and] the likelihood that the denial would substantially impair the defendant's ability to

defend himself . . . ." (Citations omitted; internal quotation marks omitted.) Id., 714.

Under the circumstances, and with due regard for the broad leeway possessed by trial courts to grant or to deny continuances, it cannot be said that the court abused its discretion in denying the defendant's request for a continuance. Although it is true that the length of the continuance that the defendant requested was relatively short and that the trial apparently was on or ahead of schedule, the court nevertheless was under no obligation to grant the request. As the trial court noted, defense counsel had known for a long time that Credle was likely to be a defense witness, yet the record is devoid of any indication that he took any action to locate Credle until very near the end of the trial.[43] Furthermore, at defense counsel's request, the court recessed early on Thursday, thereby affording defense counsel at least some additional time to locate Credle. Finally, the defendant's claim of a violation of his right to present a defense is undermined by defense counsel's failure to question either Scott or Rivera in connection with his third-party culpability defense. For all the foregoing reasons, the trial court's denial of the defendant's eleventh hour request for a continuance was not unreasonable.

D

The defendant finally claims that the trial court improperly permitted the state to present evidence of

[43] The defendant suggests that defense counsel's failure to attempt to locate Credle was due to the fact that Credle had been identified as a possible state's witness. That fact alone does not help the defendant because the state had identified Credle as a *potential* witness only. In view of the fact that neither the state nor the defense was obligated to call any witness so identified, defense counsel's failure to subpoena or otherwise to locate Credle cannot be excused merely because Credle appeared on the state's witness list.

the defendant's post-*Miranda* silence. This claim also is unpersuasive.

As I previously explained, the defendant testified in his own defense and denied that he had anything to do with the victim's murder. With respect to the victim's blood that was found on his clothing, the defendant explained, for the first time at trial, that Credle had led him to the victim's body. At that time, the defendant removed his sweatpants, which Credle dipped in the victim's blood and then returned to the defendant, who put them back on. According to the defendant, the victim's blood had found its way onto the defendant's tank top because the defendant previously had removed the tank top and placed it in a pocket of his sweatpants. The defendant further testified that the tank top was in the pocket of his sweatpants when Credle dipped them in the victim's blood.

At trial, the senior assistant state's attorney (state's attorney) asked the defendant, "[O]ther than your lawyer, could you please tell . . . the jury when is the first time that you told someone in authority, like a judge, a prosecutor or a police officer, this story about your sweatpants being dipped in blood?" Defense counsel objected to the state's attorney's question, and the trial court overruled the objection. After the state's attorney repeated the question, the defendant responded that he had provided that version of the events for the first time "in this courtroom." The state's attorney then asked the defendant, "Now . . . you say the first time that you said this was in this courtroom. When in this courtroom was the first time this was said?" Defense counsel again objected, claiming that the question violated the defendant's right to remain silent after having been advised of that right in accordance with *Miranda*. The trial court again overruled defense counsel's objection. The defendant then answered, "It was yesterday."

In *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the United States Supreme Court held that "the use for impeachment purposes of a [defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." Id., 619. Under *Miranda*, a suspect who is in custody must be advised, prior to police interrogation, of certain rights, including the right to remain silent and that anything he says may be used against him. *Miranda* v. *Arizona*, 384 U.S. 436, 467–69, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). "Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle* v. *Ohio*, supra, 617. In other words, " '[such] silence . . . is "insolubly ambiguous" because it may constitute a reliance upon those rights rather than a tacit admission that the accused has an insufficient defense or explanation for his conduct.' " *State* v. *Canty*, 223 Conn. 703, 710, 613 A.2d 1287 (1992). Moreover, "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 712–13, 759 A.2d 995 (2000). When, however, a defendant who has been given *Miranda* warnings elects to waive his right to remain silent and provides the police with a statement, *Doyle* generally does not apply. See, e.g., id., 716 n.30. "[I]n such circumstances, it is permissible to cross-examine a defendant about details that he or she may have omitted from responses to police questioning because the defendant,

having agreed to speak with police about the subject matter of the crime, cannot later complain that he had failed to mention those details in the exercise of his fifth amendment right to remain silent." Id., 716–17 n.30.

Like most other constitutional violations, *"Doyle* violations are . . . subject to harmless error analysis." (Internal quotation marks omitted.) Id., 717. "A *Doyle* violation may, in a particular case, be so insignificant that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible question or comment upon a defendant's silence following a *Miranda* warning. Under such circumstances, the state's use of a defendant's [post-arrest] silence does not constitute reversible error. . . . The [error] has similarly been [found to be harmless] where a prosecutor does not focus upon or highlight the defendant's silence in his cross-examination and closing remarks and where the prosecutor's comments do not strike at the jugular of the defendant's story. . . . The cases [in which] the error has been found to be prejudicial disclose repetitive references to the defendant's silence, reemphasis of the fact on closing argument, and extensive, strongly-worded argument suggesting a connection between the defendant's silence and his guilt." (Internal quotation marks omitted.) Id., 718.

The state contends that *Doyle* is inapplicable because the defendant did not elect to exercise his right to remain silent after being advised of his *Miranda* rights but, rather, provided the police with a detailed confession. In *State* v. *Silano,* 204 Conn. 769, 778–84, 529 A.2d 1283 (1987), however, this court considered and rejected an argument by the state that *Doyle* is inapplicable in circumstances that were identical in all material respects to those of the present case. We explained: "The state may impeach a defendant by cross-examina-

tion concerning a prior inconsistent statement made after arrest and the giving of *Miranda* warnings, even though such impeachment may call into question a defendant's silence about the truth when he made that prior inconsistent statement. . . . Such an examination is allowed because it is impossible to bifurcate a prosecutor's questions concerning inconsistency into those relating to facts contained in a prior statement and those concerning facts omitted therefrom. . . . A prosecutor may not, however, question a defendant about his silence after the interrogation has ceased, since a defendant may reassert his right to remain silent at any time, and if he ceases to answer questions, or to come forward with additional or correcting information after questions are no longer being asked of him, there is a reasonable possibility that he is relying upon that right. . . . [T]herefore . . . [a prosecutor's] question concerning the defendant's failure *ever again to contact the police [to explain that the defendant's story was untrue], after he [has] been arrested and given a Miranda warning, [is] improper under the strictures of Doyle.*"[44] (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 780–81. Thus, contrary to the state's contention, it was improper for the state's attorney in the present case to question the defendant regarding his failure to have contacted "a judge, a prosecutor or a police officer," after the police interrogation had ceased, for the purpose of correcting his story.

As in *Silano*, however, the *Doyle* violation in the present case was harmless. The improper questioning was relatively brief, and the state's attorney's closing argument contained no reference to the fact that the defendant had not contacted the authorities to correct

---

[44] In *Silano*, we nevertheless concluded that the *Doyle* violation was harmless. *State* v. *Silano*, supra, 204 Conn. 782, 784.

his story.[45] Furthermore, as I have explained, the evidence against the defendant was overwhelming, and the defendant's version of the events surrounding the victim's murder was "transparently frivolous . . . ." (Internal quotation marks omitted.) Id., 781. Under the circumstances, therefore, there is no reasonable possibility that the state's attorney's improper questions had any bearing on the jury's guilty verdict.

## III

To maintain public confidence in our system of justice, judicial opinions must be true to the legal principles that they purport to apply, such that, at a minimum, those opinions must represent a reasoned attempt to decide the issues presented in accordance with those applicable principles. Regrettably, the plurality and concurring justice fail to meet this standard both with respect to their analyses and resolution of the *Golding* issue raised by this case, and with respect to their analyses and resolution of the issue of whether the defendant is entitled to piggyback on his mother's purported refusal to consent.

Nevertheless, there may be some who hail today's decision as a courageous vindication of an important constitutional right. Nothing could be farther from the truth. Even if there is merit to the constitutional principle recognized today by the plurality and concurring justice, they have achieved that end at the expense of fair and objective decision making. The result is a seri-

---

[45] The defendant asserts that, on four occasions during closing argument, the state's attorney underscored the defendant's failure to contact the authorities to correct his story. A careful review of the record, however, reveals that the comments on which the defendant relies pertained only to the patent inconsistencies between the confession that the defendant had given to police and his exculpatory trial testimony. That argument was proper because, as I explained previously, the state is free to impeach a defendant with such inconsistencies. See, e.g., *State* v. *Silano*, supra, 204 Conn. 780–81.

ous miscarriage of justice. Because the defendant's murder conviction should be affirmed, I dissent.